Jane Ellyn BENSON, Petitioner,

v.

**Cal TERHUNE Jr., Director of the California Department of Corrections, Respondent.**

No. C00–1360PJH.

United States District Court,
N.D. California.

July 26, 2001.

Donald A. Lipmanson, Navarro, CA, for Petitioner.

Ronald A. Bass, Senior Asst. Atty. Gen., Peggy S. Ruffra, Gregory A. Ott, David P. Druliner, CA State Attorney General's Office, San Francisco, CA, for Respondent.

## DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS

HAMILTON, District Judge.

Now before the court is the petition for a writ of habeas corpus filed by state prisoner, Jane Ellyn Benson, pursuant to 28 U.S.C. § 2254. Having reviewed the parties papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES petitioner's petition.

### INTRODUCTION

On June 15, 1987, Jane Ellyn Benson, ("petitioner"), went to the home of Elaine Wright ("Wright") and her fiance, Joe McMahon ("McMahon") believing that McMahon had stolen some of her property. Around 7 a.m., petitioner burst into the bedroom where McMahon and Wright were sleeping and screamed at them demanding the return of her property. Peti-

tioner was carrying a Raven 25–caliber pistol in her right hand. She fired one shot into the floor, moved closer to the bed, and then fired a second shot in the same direction.

Petitioner left the bedroom with McMahon following her into the living room, and then walked back into the bedroom where Wright remained in bed. McMahon heard shouting, and then a third shot. McMahon and Melinda, Wright's sister, ran into the bedroom and found petitioner standing several feet away from the bed facing Wright, still holding the gun in her right hand. Wright had been shot in the chest and died of her wounds.

Petitioner contended that Wright was accidentally shot when Wright attempted to grab the gun from petitioner. However, forensic tests revealed that accidental discharge of the gun was unlikely since no gunshot residue was found on Wright's hands. The tests also proved inconsistent with petitioner's testimony that Wright was near the muzzle when the gun was fired.[1]

### FACTUAL HISTORY

Petitioner has a history of medical and drug abuse problems. At the time of her arrest, petitioner suffered from chronic back pain arising from a 1979 back injury and two surgical attempts to repair that injury. She regularly abused alcohol and drugs including marijuana, methamphetamine, heroin, cocaine, and various prescription drugs. She also used a TENS (transcutaneous electric nerve stimulator) unit to control pain. On the morning of the crime, petitioner admitted to being under the influence of methamphetamine.

---

1. The facts are set forth in a partially published opinion, *People v. Benson,* 210 Cal.App.3d 1223, 259 Cal.Rptr. 9 (1989).

Petitioner's petition for writ of habeas corpus concerns the periods she was in custody prior to and during her trial. Petitioner was arrested, booked for murder, and taken into custody at the Lake County Jail on June 16, 1987. She remained in custody until June 29, 1987, when she was released on bail. From June 16 to June 29, Lake County jail medical staff prescribed petitioner the following drugs: Valium, an anti-anxiety medication to relieve muscle spasms; Bentyl, an antispasmodic for gastrointestinal tract; Robaxin, a muscle relaxant; Tagamet, an antacid; and Phenergan, an expectorant for cough. The medical staff administered these drugs in varying combinations and doses.

The court ordered petitioner back into custody on January 11, 1988, for failure to appear in court. Petitioner was released on bail again on January 28, 1988, but was remanded back into custody on February 3 for failure to appear in court. The court found a reasonable basis for her first absence on January 11, excused it, and renewed her bail eligibility. She was remanded a second time on February 3 because she arrived a few minutes late for court. After which, petitioner remained in custody throughout her trial up until her trial concluded and she was sentenced on April 1, 1988.

Starting on February 3, 1988, when petitioner returned to jail, she complained of back pain and insomnia for which the jail medical staff administered a combination of drugs including: Benadryl to aid with sleep; Motrin, an anti-inflammatory analgesic; Valium for petitioner's back muscle spasms; a cocktail of Tylenol 3 with Codeine, an analgesic, combined with Robaxin and Nalfon, an anti-inflammatory, to relieve pain. The mental health unit also prescribed Elavil, an anti-depressant and Vistaril, an anti-anxiety drug. The medical treatments usually lasted for several days to a week, sometimes up to nineteen days depending on the nature of petitioner's physical condition and complaints. Petitioner also requested to see her own doctor and that her TENS unit from home be brought to her for her back pain. However, petitioner failed to follow up on these requests.

## PROCEDURAL HISTORY

On February 16, 1988, a Lake County jury convicted petitioner of second-degree murder, with enhancements for use of a firearm (Cal.Penal Code §§ 187 and 12022(a) and 12022.5(a)(1)). She was sentenced to 17 years to life in prison. The California Court of Appeals affirmed petitioner's conviction and sentence on February 25, 1989. The California Supreme Court denied review on August 10, 1989.

On March 22, 1988, petitioner filed her first state habeas corpus petition in Lake County Superior Court alleging ineffective assistance of counsel and inadequate medical care. On April 12, 1988, petitioner filed a second petition, which was consolidated with the first petition. On April 22, 1988, the superior court denied the claim of inadequate medical care and shortly thereafter on July 22, 1988, petitioner voluntarily dismissed her ineffective assistance claim and withdrew her habeas petition on that issue.

On March 7, 1991, petitioner filed a second state habeas petition in superior court which was denied on the day it was filed. The California Court of Appeals denied her petition for review on April 3, 1991. Subsequently, the California Supreme Court denied her petition on May 22, 1991.

On May 23, 1991, petitioner filed her first federal habeas petition, alleging that involuntary medication had impaired her ability to fully participate in her defense during trial. This court denied the petition on March 10, 1992. The Ninth Circuit Court of Appeals affirmed the district

court ruling on April 29, 1994, while authorizing filing of another habeas petition in district court.

■ On November 17, 1994, petitioner filed her second federal habeas petition. She also moved to enlarge the record to reassert her claim that she had been involuntarily medicated without her consent and that the medication compromised her ability to fully participate in her defense during trial. On November 15, 1995, this court granted the motion to expand the record and ordered respondent to show cause why a writ should not be issued. On May 28, 1996, this court dismissed the petition without prejudice and without ordering an evidentiary hearing so that petitioner could exhaust her state court remedies.[2]

On July 29, 1996, petitioner filed her third state habeas petition with the California State Supreme Court. Petitioner alleged that during her detention at Lake County jail: 1) she was medicated with numerous drugs against her will and without her informed consent; 2) medical staff denied her requests for drug-free treatments to relieve chronic back pain; and 3) the effects of the drugs impaired her ability to testify and behave properly at trial and to communicate with her counsel and with the court during trial and sentencing.

On March 12, 1997, the California Supreme Court issued an order requiring respondent to show cause why petitioner should not receive a new trial based on her claim that she was involuntarily medicated. On May 13, 1997, respondent filed an amended return to the order to show cause. On May 15, 1997, petitioner filed a denial to respondent's amended return.

Beginning on August 26, 1997, Judge David H. Herrick conducted a ten-day evidentiary hearing in Lake County Superior Court. Following the hearing, Judge Herrick discharged the show cause order and denied the petition. Petitioner renewed the collateral attack upon her conviction in the California Court of Appeals on March 24, 1998 which subsequently denied the petition on August 6, 1998.

On November 9, 1998, petitioner filed a writ of habeas corpus again in the California Supreme Court which was summarily denied on January 25, 2000. Petitioner, then, on April 19, 2000, filed the instant petition.

### THE EVIDENTIARY HEARING

At the evidentiary hearing on August 26, 1997, the main issue pertained to whether the petitioner had voluntarily ingested medication administered by the jail medical staff. Petitioner argued that she was involuntarily medicated almost every day she remained in the Lake County jail, a period which included most ·of her trial. She presented testimonial and documentary evidence to show: 1) she refused all medication for a four-day period beginning on January 14, 1988, less than two weeks before her trial began; 2) she began accepting mind-altering drugs, prescribed, and distributed by jail staff, solely because they refused her requests for alternative treatments to relieve back pain; 3) she was coerced into ingesting medication by an implied threat of confinement in the "rubber room" if she refused them; and 4) the medication impaired her thinking to

---

**2.** Under 28 U.S.C. § 2244(b), a petition to file a second or successive appeal must be dismissed unless petitioner's claims are either based on a new rule of constitutional law made retroactive by the Supreme Court or the discovery of new, material evidence. However-

er, § 2244 does not apply where the first petition was dismissed without prejudice for failure to exhaust state remedies. *See Slack v. McDaniel,* 529 U.S. 473, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

the extent she lost the mental capacity to freely decide whether to ingest them.

Respondents countered that petitioner ingested medication voluntarily and that she had the mental ability to freely choose to either request or refuse medication.

Judge Herrick denied the petition, ruling that the petitioner was not involuntarily medicated. Judge Herrick relied on both federal and state cases, *Riggins v. Nevada* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), *People v. Jones*, 15 Cal.4th 431A, 15 Cal.4th 119, 61 Cal. Rptr.2d 386, 931 P.2d 960 (1997), *cert denied*, 522 U.S. 955, 118 S.Ct. 381, 139 L.Ed.2d 297 (1997), and *People v. Bradford*, 15 Cal.4th 1229, 65 Cal.Rptr.2d 145, 939 P.2d 259 (1997), *cert denied*, 523 U.S. 1118, 118 S.Ct. 1796, 140 L.Ed.2d 937 (1998) for the proposition that some objection on the record had to exist to find that medication was administered involuntarily.

Judge Herrick ruled that petitioner voluntarily requested medication as evidenced by the ninety inmate request slips for medical treatment. He noted that the requests slips were all complete, comprehensible, and inconsistent with a person who suffered from psychoses or delirium. Moreover, the jail medical staff honored any and all refusals made by petitioner, as she did on three different occasions. Judge Herrick did not find any evidence of coercion, undue influence, or threats to induce petitioner to take medication.

Although the court found no informed consent existed, Judge Herrick concluded that informed consent was not required to find that medication had been voluntarily taken in the context of *Riggins; Jones*, and *Bradford*. Given petitioner's history of drug use and abuse, Judge Herrick opined that petitioner had a working knowledge of the effects and consequences of drugs, and therefore, knew how she would be affected.

Although Judge Herrick acknowledged that petitioner suffered significant adverse effects from the medication, he nevertheless concluded that petitioner was capable of logical thought and rational decision making as indicated by her trial testimony and corroborated by the testimony of other witnesses. He found that petitioner was competent to stand trial and had the ability to exercise free will in deciding to take or refuse any medication.

## DISCUSSION

### A. Legal Standard

■ A defendant's Sixth and Fourteenth Amendment rights are violated by the forced administration of anti-psychotic medication during trial without a determination through a judicial hearing that the drugs are medically appropriate and essential for the safety of the defendant and others. *Riggins v. Nevada*, 504 U.S. 127, 132–38, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). *Riggins* announced a new rule of law that may be applied retroactively under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), because it is a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. *See Flowers v. Walter*, 239 F.3d 1096, 1104–08 (9th Cir.2001). Accordingly, a *Riggins* claim may be raised in a second or successive habeas petition as long as the claim was "previously unavailable." *See id.* at 1104 (applying 28 U.S.C. § 2244(b)(2)(A)).

The amendment to 28 U.S.C. § 2254, enacted as part of the Anti-terrorism and Effective Death Penalty Act (the "AEDPA") of 1996 provides,

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

■■■ A state court's decision is "contrary to" Supreme Court law if the state court "arrives at a conclusion opposite to that reached by this Court on a question of law," or reaches a different conclusion based on facts undistinguishable from a Supreme Court case. *Williams v. Taylor,* 529 U.S. 362, 364, 120 S.Ct. 1495, 1498, 146 L.Ed.2d 389 (2000). A state court's decision constitutes an "unreasonable application" of Supreme Court precedent if the state court identifies the correct governing legal principles, but the application of the law to the facts is objectively unreasonable. *Id.* at 529 U.S. 362, 120 S.Ct. 1495. Accordingly, a federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. *Id.* at 529 U.S. 362, 120 S.Ct. 1495.

■■■ In *Tran v. Lindsey,* 212 F.3d 1143, (9th Cir.2000), the Ninth Circuit construed an "unreasonable application" as one that is "clearly erroneous." *Id.* at 1149–54. Under the AEDPA, the court can grant habeas relief when its review of the legal question

> does not merely allow [it] ultimately to conclude that the petitioner has the better of two reasonable legal arguments, but rather leaves [it] with a "firm conviction" that one answer, the one rejected by the court, was correct and the other,

the application of the federal law that the court adopted, was erroneous—in other words that clear error occurred. *Id.* at 1153–54. Accordingly, a state court decision may not be overturned on habeas review simply because of a conflict with circuit law. *Id.* at 1154; *Duhaime v. Ducharme,* 200 F.3d 597, 598 (9th Cir.1999).

### B. Petitioner's Writ of Habeas Corpus

#### 1. *Riggins v. Nevada* Analysis

■■■ Petitioner seeks a writ of habeas corpus arguing that the state court's ruling that medication administered to petitioner was not involuntary constituted an unreasonable interpretation of established federal law. Petitioner contends that medication administered to petitioner was psychoactive and that she did not take them voluntarily, therefore justifying a *Riggins* analysis.

Respondent counters that *Riggins* does not support petitioner's claims because the Lake County jail medical staff did not administer anti-psychotic drugs to petitioner. Respondent argues that the *Riggins* court specifically limited its holding to the involuntary administration of anti-psychotic drugs which does not include the muscle relaxants and pain and anxiety relievers given to petitioner.

In *Riggins,* the Court reversed the Nevada Supreme Court's ruling upholding the defendant's conviction because the state courts had failed to make findings sufficient to justify the forced administration of Mellaril, an anti-psychotic drug, to the defendant during his trial. 504 U.S. at 137, 112 S.Ct. 1810. The Court reasoned that the trial court had made no determination concerning the need for the drug or its medical appropriateness and had made no findings about reasonable alternatives. *Id.* Therefore, the Court held that this error may have violated the defendant's Sixth and Fourteenth Amendment rights,

including his right to a full and fair trial and his due process liberty interest in freedom from unwanted anti-psychotic drugs. *Id.*

Although Mellaril, the drug at issue in *Riggins,* technically bears the term "anti-psychotic," the Court did not expressly limit or delineate the category of anti-psychotic drugs to which the holding applies. Relying upon and citing its earlier opinion in *Washington v. Harper,* 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), the Court's decision in *Riggins* encompassed medication that "alter[s] the chemical balance in a patient's brain, leading to changes intended to be beneficial, in his or her cognitive processes." In *Harper,* the Court acknowledged that anti-psychotic drugs are also called "neuroleptics" or "psychotropic drugs" because such medication "assist[s] the patient in organizing his or her thought processes and regaining a rational state of mind."[3] *Id.* at 213, 110 S.Ct. 1028. Consequently, the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229, 110 S.Ct. 1028.

The *Riggins* court was concerned that the effects of medication on the defendant's demeanor and mental state during trial would deny him due process since it was possible that potential drug side effects would impact his outward appearance as well as the content of his testimony and his ability to communicate with counsel. 504 U.S. at 137, 112 S.Ct. 1810. The Court noted that the side effects of these drugs could prejudice the defense by impacting not only the defendant's behavior, but also his credibility and persuasiveness in front of jurors. *Id.* Potential side effects range from conspicuous physical symptoms such as restlessness, tremor of the limbs, diminished range of facial expression, and slowed functions such as speech to more

subtle effects like sedation, drowsiness, and unresponsiveness. *Id.* at 143, 112 S.Ct. 1810. Justice Kennedy in his concurring opinion recognized the fact "that such effects may be subtle does not make then any less real or potentially influential." *Id.* (quoting brief from American Psychiatric Association as Amicus Curiae 13).

This court rejects respondent's narrow reading that the *Riggins* holding applies only to drugs deemed "anti-psychotic." In the present case, petitioner alleges that medication administered to her by the Lake County medical staff prior to and during trial unduly prejudiced her compelling a new trial. The drugs taken by petitioner including Valium, Vistaril, and Elavil alter the chemical processes in the mind and may have potential side effects similar to those induced by Mellaril and other anti-psychotic drugs (e.g. sedation, drowsiness, agitation, aggression, inappropriate behavior, and anxiety). Since petitioner's claims implicate her due process liberty interest to be free from involuntary medication, her claims properly fall within the scope of the *Riggins* decision. Thus, the issue becomes whether the medication of petitioner was forced or voluntary.

2. Voluntariness

Petitioner argues that she did not take any medication voluntarily because the jail medical staff effectively coerced her into ingesting medication by 1) knowingly depriving her of non-drug alternatives to control her back pain; 2) creating coercive circumstances rendering her medication involuntary; 3) refusing her requests for review and modifications of medication; 4) subjecting her to the threat of solitary confinement in the strip cell; and by undermining her capacity to refuse medication. Petitioner also contends that medication was forced and given involuntarily

**3.** The term psychotropic means acting on the mind.

because she lacked knowledge of the medication's potentially debilitating effects.

Respondent refutes petitioner's claims that medication was administered involuntarily on the ground that petitioner made no formal or informal objections to such administration. Respondent contends that petitioner initiated every medical treatment she received in jail and that she never asked the staff to terminate her medication. Respondent also points out that petitioner did not manifest the degree of ill side effects she now claims. Additionally, respondent argues that petitioner's prior history of drug use and abuse should have made her aware of any potential side effects.

 Under *Riggins* and *Harper*, forcing anti-psychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness after having considered less intrusive alternatives. *Riggins*, 504 U.S. at 135, 112 S.Ct. 1810; *Harper*, 494 U.S. at 227, 110 S.Ct. 1028. The Due Process Clause requires prison officials to demonstrate that involuntary administration of any medication is necessary for the safety of the defendant or others and justifies essential state interests like rendering the defendant competent for trial. However, the state becomes obligated to establish the necessity and appropriateness of medication only after the defendant moves to terminate the administration of anti-psychotic medication. Therefore, *Riggins* and *Harper* require the defendant to prove that medication was administered involuntarily before the court even moves to the next step of the analysis.

 Although this court recognizes no specific test for voluntariness, the United States Supreme Court as well as the California Supreme Court have predicated the concept of voluntariness on an affirmative act made by the defendant to discontinue

his medication. *See Bradford*, 15 Cal.4th 1229, 65 Cal.Rptr.2d 145, 939 P.2d 259 (1997) (holding that defendant's medication was not involuntary because he did not move to terminate the administration of medication, or otherwise assert that he was being medicated involuntarily); *Jones* 15 Cal.4th 431A, 15 Cal.4th 119, 61 Cal. Rptr.2d 386, 931 P.2d 960 (1997) (holding that *Riggins* did not apply because defendant did not move to terminate his medication and his refusals on prior occasions were honored). In *Riggins*, the defendant made a motion to suspend the administration of Mellaril until after his trial. Consequently the continued medication of the defendant with Mellaril became involuntary once the district court denied his motion to terminate its use. 504 U.S. at 486, 112 S.Ct. 2072. In *Harper*, the defendant initially consented to the administration of anti-psychotic drugs and later refuse to continue medication. The treatment became involuntary when the state sought to continue medication over his objections thus requiring a judicial hearing. 494 U.S. at 213–215, 110 S.Ct. 1028.

The state court's ruling that petitioner's medication was not administered involuntarily did not constitute an unreasonable application of federal law as set forth in *Riggins* and *Harper*. The issue of voluntariness turned upon whether petitioner refused her medication and whether she was mentally competent to refuse. Although the efficacy of the medication administered to petitioner is not at issue, this court finds it troubling that the jail medical staff prescribed such a powerful combination of drugs, often in high doses, to relieve minor conditions as back pain, insomnia, and mild depression. However, the record shows that petitioner did not make any formal requests to terminate her medication. Plaintiff, in fact, submitted over ninety written request forms to receive medical attention from both the jail

medical staff as well as the mental health unit. The state court found the requests to be legible, understandable, and indicative of petitioner's capacity to refuse. On the two or three occasions that petitioner refused to see the nurse and/or objected to her medication, the medical staff honored her refusals.

Under the "clear error" standard, the state court's conclusion that petitioner was mentally competent to request and refuse medical treatments was not unreasonable. Petitioner concedes that she initiated most of the medical visits and never asked to terminate her medication. Nevertheless, petitioner attempts to argue around this fact by asserting that medication was administered involuntarily because of the coercive nature of the prison environment. The state court determined that in spite of the inherent coercive nature of prisons, the staff did not threaten or forcibly influence petitioner to take medication. The record supports this conclusion based on the testimony of the staff physician and nurse.

Moreover, it was clearly not unreasonable for the state court to conclude that medication taken by petitioner did not impair her to the extent that she lacked the ability to refuse such medication. The state court at the evidentiary hearing found that petitioner was capable of logical thought and cogent expression as revealed by the "clarity, specificity, logic, and appropriateness" of petitioner's trial testimony. Upon an independent review of petitioner's trial testimony, this court agrees with the state court's ruling that petitioner had the ability to exercise free choice over the administration of medication and that the effects of medication did not compromise petitioner's ability to assist counsel. The record contained in the trial transcript indicates that petitioner did not experience or manifest the serious kinds of symptoms that may have prejudiced her during trial. The expert witnesses proffered by respondent at the evidentiary hearing supported the state court's conclusion that petitioner was in control of her psychoses and cognitive abilities, despite any medication. Additionally, the state court pointed out, of all the court personnel during the trial, including the lawyers, the judge, bailiff, jailers, and the medical staff, only two observers, a correctional officer at the jail and petitioner's alcohol counselor, noticed negative effects in petitioner contradicting her claims of extreme hallucinations, delirium, or stupor.

■ Petitioner's allegation that the medical staff withheld information about the nature and effects of the medication raises the issue of informed consent. However, not only is informed consent not a requisite of voluntariness,[4] but petitioner's familiarity with both recreational and prescription drugs based on past experience undermines her claim of substantial cognitive impairment. Although petitioner disputes the extent of her drug use as characterized by respondent, no question exists as to the fact that petitioner consistently used a variety of recreational and prescription drugs. It is significant that petitioner had previously worked as a nurse and had previously used at least two of the medications given to her in jail, Valium and Tylenol with Codeine. She, therefore, knew how she would be affected, at least by those drugs. Furthermore, petitioner had several months when she was out on bail to recover from jail-imposed medical treatment and to decide which drugs produced inimical effects. Consequently, petitioner could have readi-

---

4. *See Jones,* 15 Cal.4th 119, 15 Cal.4th 431A, 61 Cal.Rptr.2d 386, 931 P.2d 960 (holding that the state does not have to demonstrate that a criminal defendant has furnished informed consent for any anti-psychotic medication provided by the state).

ly refused any similar medication during her subsequent period of incarceration.

Accordingly, the state court's application of established federal law as set forth in *Riggins* was not clearly unreasonable.

## CONCLUSION

In accordance with the foregoing, petitioner's petition for a writ of habeas corpus is DENIED.

This order fully adjudicates the petition listed at No. 1 of the clerk's docket for this case and terminates all other pending motions. The clerk shall close the file.

**IT IS SO ORDERED.**