Jane Ellyn BENSON, Petitioner–
Appellant,

v.

Cal TERHUNE, Director; Susan E.
Poole, Warden, Respondents–
Appellees.

No. 01–16833.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 10, 2002.
Filed Sept. 11, 2002.

Donald L. Lipmanson, Navarro, CA, for the petitioner-appellant.

Gregory A. Ott, Deputy Attorney General, San Francisco, CA, for the respondent-appellee.

Before SCHROEDER, Chief Judge, FISHER and PAEZ, Circuit Judges.

## OPINION

FISHER, Circuit Judge.

California state prisoner Jane Ellyn Benson appeals the district court's denial of her petition for a writ of habeas corpus challenging her 1988 jury trial conviction for second degree murder with a firearm and her 17–years–to–life sentence. Benson contends that while she was in jail before and during her trial, the jail staff medicated her with mind-altering psychotropic and other drugs without her informed consent, thereby violating her right to due process and to a full and fair trial. Although the powerful combination of drugs prescribed to relieve Benson's relatively minor back pain, insomnia and mild

depression raises serious questions, on the facts established here we affirm the district court's denial of habeas relief.

## FACTUAL AND PROCEDURAL HISTORY

On June 16, 1987, Jane Benson, carrying a Raven .25 caliber pistol, went to the home of her friend, Elaine Wright, in an attempt to recover property that Wright's fiancé purportedly had stolen. Benson, who admitted she was under the influence of methamphetamine at the time, fatally shot Wright as she lay in bed.

That same day, Benson was arrested, booked for murder and taken into custody at the Lake County Jail in Clearwater, California. The jail staff requested the medical and mental health staff to interview Benson because of the nature of her crime and because she was visibly upset at the time of her detention. During her medical intake interview with Nurse Eleanor Harr, Benson, who had training as a practical nurse, disclosed her extensive history of medical and drug abuse problems. At the time of her detention, Benson also suffered from chronic spasmodic back pain—due to a 1979 back injury and two surgeries to repair it—treated and controlled by a transcutaneous electric nerve stimulator (TENS) unit and prescription pain medications. Benson admitted that she abused alcohol, prescription medications and illicit drugs, including marijuana, methamphetamine, heroin and cocaine. A mental health counselor also conducted a psychiatric assessment to determine whether there was a need for psychiatric services and psychotropic drug treatment.[1] At the conclusion of the evaluations, the medical and mental health staff collectively decided to place Benson on a drug withdrawal protocol to curb her addiction to illegal drugs and to alleviate the related side effects.

Lake County Jail medical procedures require an inmate to complete "sick call slips" to request medical treatment from the nurse practitioner, who then may refer the inmate to a physician or mental health provider. For psychotropic drug treatments, the psychiatrist contacts the medical staff to order and administer the drugs to the patient. According to jail protocol, the staff dispenses all medications daily at four strictly enforced, scheduled times, in envelopes marked with only the drug administration time and the inmate's name. The medications normally are to be ingested all at the same time.[2]

During the 87 days Benson spent in custody prior to sentencing, she submitted over 90 requests for a variety of ailments. Between the date of Benson's arrest and June 29, 1987, the date of her first release on bail, Benson initiated medication requests for back pain, muscle spasms and a cough, for which the staff prescribed and administered the following drugs in varying combinations and dosages: Valium (muscle relaxant and antianxiety medi-

---

**1.** The term "psychotropic" means "having an altering effect on perception or behavior." The American Heritage Dictionary of the English Language (3d ed.1996). Psychotropic drugs are "medications commonly used in treating mental disorders.... [T]he effect of these and similar drugs is to alter the chemical balance in the brain, the desired result being that the medication will assist the patient in organizing his or her thought processes and regaining a rational state of mind."

*Washington v. Harper,* 494 U.S. 210, 214, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

**2.** The staff who administered the drugs to the inmates did not always know the contents of the envelopes which contained the drugs they administered at the direction of the prescribing doctors. Thus, if an inmate wanted to refuse a particular drug, the inmate often would have to be able to pick the specific pill out of the group contained in the envelope.

cation, considered to be a psychotropic drug); Bentyl (antispasmodic medication for gastrointestinal tract); Robaxin (anti-inflammatory); Tagamet (antacid); and Phenergan (cough expectorant).

Benson remained out of custody on bail for more than six months until January 13, 1988, when the court ordered her back into custody for failure to appear in court on time. On January 14, 1988, Nurse Harr attempted a follow-up interview with Benson, who refused; and Benson made no requests for medications for four days. The staff did nothing to impose medication on Benson during this time. Then, on January 18, Benson resumed her self-initiated medication requests, which included relief from insomnia and additional or higher dosages of back pain medication. In response to her various medical complaints, the staff prescribed and administered a combination of drugs that included: Benadryl (sleep inducer); Motrin (anti-inflammatory analgesic), which was later replaced by Tylenol 3 with Codeine; Nalfon (anti-inflammatory); and Valium. On his own initiative, the staff psychiatrist ordered the administration of Elavil, a psychotropic antidepressant, to control Benson's anxiety for six days until her trial began. Each of these treatments lasted for several days in varying dosages depending on the nature and progress of Benson's physical and mental condition; when her condition would improve or when she did not exhibit the expected results,

the staff would stop administering the relevant medication.

Benson's 22–day trial began on January 26, 1988. Two days later, the court released Benson on bail for the second time, but after one week ordered her back into custody, where she remained until the conclusion of her trial.

On her first day back in jail, Benson requested the same medications she previously had taken to manage her back pain and muscle spasms: Robaxin, Valium, Tylenol 3 with Codeine and Nalfon. Throughout her trial, she took—with-out objection—the same combination of drugs, except Valium, which was replaced by Vistaril, another psychotropic, antianxiety drug. This change in medication resulted from a medical consultation, around the time of Benson's trial testimony, after she complained of increased anxiety and restlessness. On February 16, 1988, the jury convicted Benson of second-degree murder with a firearm.

After her conviction but before sentencing, Benson—still in the Lake County jail—continued to complain about various medical problems and requested skin rash ointment, toothache medication, nonprescription Tylenol and stronger drug dosages of her existing medications.[3] Her increased volatility in demanding medication led Nurse Harr to warn her that a failure to "maintain" (i.e., exercise self-control) could result in her being placed in a safety cell ("rubber room").[4] Three of Benson's

---

3. Prior to March 8, Benson claimed that she obtained and ingested "lots of [Extra Strength] Tylenol from the other girls in her cell" which caused Nurse Harr to worry about possible liver damage. Harr alerted the jail staff and imposed new rules to avoid unregulated distribution and improper usage of Tylenol in Benson's jail cell.

4. Benson's medical records indicate that the mental health staff saw Benson's condition worsen during this time. Whereas the Janu-

ary 19 mental health notes which led to the Elavil prescription note that Benson was "compliant" and "tidy in appearance," the mental health evaluations after her conviction on February 16 and 20 report the following observations: "disheveled appearance," "poor concentration," "atypical paranoid disorder" and "insight and judgement [are] nil." Because the record does not contain Benson's complete mental health record, we do not know whether any discussion or reevaluation

medical requests during this time led to meetings with the jail physician, Dr. Peter Stanley, who made only minor or no modifications to her medications.

During this postconviction, presentence period, the staff honored Benson's refusals to take her medication—when she was "mad at the jailers"—at two of the scheduled drug administration times on February 29 and March 1, 1988. Benson's refusals were short-lived, however; on both occasions she rescinded and asked for the drugs a few hours later. Additionally, after the verdict, Benson asked to see her own doctor and to have her TENS unit brought to the jail. The staff told Benson that jail policy permitted her to have her TENS unit, but it would have to be delivered by an outside source; and that her personal physician would be allowed to visit, but all prescriptions first had to be cleared with Dr. Stanley. Benson failed to follow up on either of her requests.

On April 1, 1988, the trial court sentenced Benson to 17 years to life in prison. The California Court of Appeal affirmed her conviction and sentence on direct appeal, and the California Supreme Court denied review on August 10, 1989. Thereafter, Benson, raising a claim of inadequate medical care, sought state habeas relief, which the California courts denied. After federal habeas corpus proceedings in district court and this court, Benson returned to the California state courts, filing a third state habeas petition alleging that she was involuntarily medicated and thereby was denied the opportunity to have a full and fair trial. On March 12, 1997, the California Supreme Court issued an order to show cause why Benson should not receive a new trial.

In response to that order, Lake County Superior Court Judge David H. Herrick conducted a 10-day evidentiary hearing beginning in August 1997, after which he denied the petition and discharged the order to show cause. Judge Herrick found that Benson's drug administration was voluntary based on the absence of an express objection to the medications, a plethora of comprehensible medical request slips completed by Benson and the lack of any evidence of coercion or undue influence to suggest that the medications were administered involuntarily. Judge Herrick also concluded that a pretrial detainee's informed consent was not required to make the administration of medication voluntary. Although Judge Herrick expressed some concern about the nature and strength of the medications prescribed for Benson's relatively minor ailments and about the adverse effects of the medications—referring to them as "mind numbing"—he nevertheless found that Benson was mentally competent to object to the medication but had failed to do so.

Rejecting Benson's assertion that she was prejudiced during trial due to her supposed drug-induced delirium and psychosis, Judge Herrick cited Benson's exhaustive, coherent trial testimony and unremarkable behavior throughout the trial. Although Corrections officer Katie Folk and alcohol counselor Sharon Stevens testified that they observed signs of Benson's impairment during trial, Judge Herrick found that other evidence failed to corroborate their testimony. Defense counsel Stephen Tulanian, prosecutor Steven Hedstrom and bailiff Hartmut Gall all testified that they recalled no unusual behavior to raise doubts about Benson's compe-

occurred regarding the possible side-effects of the psychotropic drugs at that time. Regardless, Benson argues only that her medication interfered with her rights to due process and a fair trial; she does not argue that the medication affected any right relating to sentencing.

tency to stand trial, except for one minor crying episode that was brought to the court's attention and did not necessitate further attention beyond a brief recess.

Following Judge Herrick's discharge of the order and denial of her petition in September 1997, Benson renewed her state collateral attack upon her conviction. The California Supreme Court finally denied her relief on January 25, 2000. Benson filed her third federal habeas petition on April 19, 2000; the district court denied it on July 26, 2001. Benson timely appealed.

## STANDARD OF REVIEW

■■■ We review de novo the district court's decision to deny a § 2254 habeas petition. *Alvarado v. Hill,* 252 F.3d 1066, 1068 (9th Cir.2001). Benson's petition, filed after April 24, 1996, is subject to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lockhart v. Terhune,* 250 F.3d 1223, 1228 (9th Cir.2001). Under AEDPA, we may reverse a state court's decision denying relief only if the decision either was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[5] A state court's decision is an "unreasonable application" of federal law if it either correctly identifies the governing rule but applies it to a new set of facts in a way that is objectively unreasonable, or if it extends or fails to extend a clearly established legal principle to a new context in a way

that is objectively unreasonable. *Van Tran v. Lindsey,* 212 F.3d 1143, 1150 (9th Cir.2000) (citation omitted).

## DISCUSSION

Benson contends that even though she requested medication for her physical problems, particularly her severe back pain, and took the medication the jail staff prescribed, her taking the drugs was neither truly voluntary nor consensual. In particular, she argues that she had no choice but to take the medications the jail staff prescribed—both in kind and in dosage—and was not given information about the drugs so she could make an informed decision whether to take them. Thus, she contends, her circumstances are akin to those of a pretrial detainee who has been forced, over objection, to ingest mind-altering psychotropic medication in violation of the right to due process under the Fifth and Fourteenth Amendments, and that trying her under such circumstances violated her right to a full and fair trial under the Sixth and Fourteenth Amendments.

### I. Voluntariness

■■■ The California courts, as did the district court, looked to *Riggins v. Nevada,* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), as the most relevant authority for determining Benson's claim of unconstitutional involuntary medication. In *Riggins,* the Supreme Court held that the forced administration of antipsychotic drugs to control the behavior of a pretrial detainee—absent overriding justification and proof of medical appropriateness—is impermissible because it may violate the

---

**5.** We must look to the last reasoned decision of the state court as the basis of the state court's judgment. *See Ylst v. Nunnemaker,* 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir.2000).

Here, the California Court of Appeal and the California Supreme Court denied Benson's habeas petition without comment. Therefore, the last reasoned decision of the state court was Judge Herrick's discharge of the show cause order and denial of her petition.

defendant's constitutional right to due process, including her right to a fair trial. *Id.* at 134–38, 112 S.Ct. 1810. In reaching this conclusion, the Court recognized the principle stated earlier in *Washington v. Harper*, 494 U.S. 210, 229, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), that the "forcible injection of medication into a nonconsenting person's body … represents a substantial interference with that person's liberty." *See Riggins*, 504 U.S. at 134, 112 S.Ct. 1810. In *Riggins*, however, unlike here, the jailed defendant had unequivocally objected to being administered a psychotropic drug—Mellaril—which the state contended was necessary to ensure his competence to stand trial. *Id.* at 130, 133, 112 S.Ct. 1810. Indeed, Riggins' attorney sought a court order halting the medication, which the trial court denied after a hearing. *Id.* at 130–31, 112 S.Ct. 1810. The Supreme Court emphasized it was undisputed that "once the [trial court] denied Riggins' motion to terminate use of Mellaril, subsequent administration of the drug was involuntary." *Id.* at 133, 112 S.Ct. 1810.[6] The Court went on to hold that "once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug." *Id.* at 135, 112 S.Ct. 1810.[7]

Because Elavil, Valium and Vistaril operated to alter the chemical processes of Benson's brain and carried with them potential side effects similar to those caused by antipsychotic drugs like Mellaril, Judge Herrick correctly determined that *Riggins* is the controlling authority here.[8] Benson's circumstances, of course, are factually different. Not only did she not object to the administration of drugs, including Elavil and Valium, but she also affirmatively sought medication to remedy her physical ailments. The California court, as did the district court, considered this dis-

---

**6.** In *Riggins*, the Court recognized that the medication became involuntary when the court ordered medication after the defendant had made an affirmative act of refusal and requested termination of the medication. 504 U.S. at 133, 112 S.Ct. 1810. The California Supreme Court also has looked to whether there was an affirmative act of refusal before finding drug administration involuntary. *See People v. Bradford*, 15 Cal.4th 1229, 65 Cal. Rptr.2d 145, 939 P.2d 259, 336–37 (1997) (holding that the court was not required to conduct an inquiry into whether medication of defendant during trial was involuntary where defendant did not raise the issue); *People v. Jones*, 15 Cal.4th 119, 61 Cal.Rptr.2d 386, 931 P.2d 960, 980–82 (1997) (holding that defendant may not raise involuntary medication issue for first time on appeal where defendant did not move to suspend medication or otherwise assert in trial court that medication was involuntary), *overruled on other grounds by People v. Hill*, 17 Cal.4th 800, 72 Cal.Rptr.2d 656, 952 P.2d 673 (1998). In *Jones*, the California Supreme Court also suggested that a defendant's medication will not be considered involuntary unless the defendant has refused the medication, moved to suspend the medication or otherwise manifested involuntariness. *Id.* at 982.

**7.** The Court did not expressly delineate the category of drugs to which the holding applies. The liberty interest at stake applies to any forced medication, 504 U.S. at 134, 112 S.Ct. 1810 (quoting *Harper*, 494 U.S. at 229, 110 S.Ct. 1028), and that interest is heightened with respect to antipsychotic drugs like Mellaril that "alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." *Id.* (quoting *Harper*, 494 U.S. at 229, 110 S.Ct. 1028). The right to a fair trial, the Court emphasized, could be violated wherever the drugs in question create the "possibility that the substance of [the defendant's] own testimony, his interaction with counsel, or his comprehension at trial [could be] compromised." *Id.* at 138, 112 S.Ct. 1810.

**8.** The side effects of Elavil, Valium and Vistaril include sedation, drowsiness, agitation, aggression, inappropriate behavior and anxiety. *See Benson v. Terhune*, 157 F.Supp.2d 1093, 1100 (N.D.Cal.2001).

tinction dispositive—and concluded that *Riggins* is not applicable unless the inmate affirmatively objects to the administration of the objectionable drug. Although we agree that Benson's case differs from *Riggins* in this respect, we cannot agree that the distinction is wholly dispositive. Thus, although we cannot conclude that the California court's decision is contrary to *Riggins*, because the facts of Benson's case differ from those in *Riggins*, the question still remains whether the California court unreasonably applied *Riggins* and other Supreme Court authority to this new factual situation.

## II. Voluntary and Knowing Consent

■ Recognizing the distinction between *Riggins* and her particular situation, Benson urges us to reach beyond *Riggins* and apply the doctrine of informed consent. Because *Riggins* does not explicitly define what makes the administration of medicine voluntary—it holds only that continued medication over a prisoner's affirmative act to refuse or discontinue the medication makes the administration of medication involuntary—Benson seeks to import into the jail drug administration context the principle of a "voluntary and knowing choice" found in cases concerning the waiver of *Miranda* rights and the validity of guilty pleas. She contends that these cases analogously implicate a defendant's constitutional right to due process. Benson asserts that even if she was mentally capable of objecting to the drugs prescribed, her acceptance of the medication was involuntary because she did not have enough knowledge about the specific drugs she ingested and their potentially debilitating side effects to make an informed—and thus voluntary—decision not to object. In making this claim she relies on the bifurcated analysis the Supreme Court has employed to determine both the validity of a waiver of *Miranda* rights and the validity of a guilty plea: (1) "voluntariness" established by the absence of coercive threats or improper promises that may undermine the defendant's free choice; and (2) "knowing and intelligent choice" determined by the defendant's full awareness and understanding of the alternative courses of action available and the consequences of each decision during criminal proceedings. *See Colorado v. Spring*, 479 U.S. 564, 573–74, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (*Miranda*); *United States v. Hernandez*, 203 F.3d 614, 619 & n. 5 (9th Cir.2000) (guilty plea). We conclude that, on the particular facts of this case, it was not an unreasonable application of *Riggins* and Supreme Court cases concerning the waiver of *Miranda* rights and the validity of guilty pleas to conclude that Benson's acceptance of the medication was both voluntary and knowing.

## A. Voluntary Consent: Free and Unconstrained Choice

In considering the waiver of *Miranda* rights, the Supreme Court has held that "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Similarly, this court has held that "[a] plea is 'involuntary' if it is the product of threats, improper promises, or other forms of wrongful coercion." *Hernandez*, 203 F.3d at 619 (citing *Brady v. United States*, 397 U.S. 742, 754–55, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)). Benson argues she was intimidated in general because she was in jail, and coerced by specific conduct of the jail staff.

Although we recognize that a jail is, in some respects, an inherently coercive setting, that circumstance alone does not suffice to establish constitutional coercion.

Otherwise, any actions taken by jail staff would be deemed coercive. As Judge Herrick expressly found, the record is devoid of any evidence that the jail staff resorted to physical force, mental intimidation, overt threats, false promises or undue influence to compel Benson to take her requested medication against her will. Benson points to Nurse Harr's admonition on one occasion that Benson "maintain"—exercise self-control—or else be sent to the "rubber room." But Judge Herrick found this was not an implied threat that she must take the drugs. Rather, Harr was attempting to regulate Benson's volatile reaction during a consultation when Harr declined Benson's request for more pain medication.

Benson also argues that she was forced to take the drugs because she had no other choice—she could not take them selectively because the jail's policy required them to be taken on an all or nothing basis, and she was denied access to non-pharmacological alternatives, including her TENS unit. The record, however, does not support either ground. Contrary to Benson's contention, the jail's formal policy would have allowed her to refuse specific drugs during the scheduled administration, although there is some evidence individual staff members would take back the entire packet of pills if an inmate objected to any of them. Benson did not object to particular drugs, though; instead, she occasionally refused *any* medication, refusals the staff honored.

The record also shows that Benson agreed with Dr. Stanley's view that the nonpharmacological alternatives would serve as additional treatments, not as replacements of her drug therapy; the alternatives would not have addressed the full range of her medical ailments. Moreover, even when the staff approved Benson's requests to use her TENS unit and to be visited by her personal physician, she failed to follow through on these options.

Applying the rubric of *Miranda* rights waiver and guilty plea cases, Benson made a free and deliberate choice to ingest the drugs in the absence of intimidation and coercion. *Cf. Mincey v. Arizona*, 437 U.S. 385, 398–401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (holding that defendant's free will was undermined by the officer's blatant disregard of his requests to desist interrogation while suffering from a debilitating physical and mental ailment). We turn, then, to the true crux of her argument: whether her uncoerced acceptance of her medications was based on a knowing and intelligent choice.

## B. Knowing Consent

■ Not only must a *Miranda* rights waiver be uncoerced, the waiver must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421, 106 S.Ct. 1135. Similarly, in the guilty plea context, we have recognized that a plea is " 'unintelligent' if the defendant is without the information necessary to assess intelligently 'the advantages and disadvantages of a trial as compared with those attending a plea of guilty.' " *Hernandez*, 203 F.3d at 619 (quoting *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)). Applying these principles to the jail drug administration context, Benson argues that an understanding of what drugs she was taking and their potential side effects was essential for her consent to medication to be deemed voluntary. She claims the jail staff did not disclose any of this information to her, so her acceptance of the prescribed medication was involuntary. Her

argument has some force.[9]

■ The due process clause of the Fourteenth Amendment substantively protects a person's rights to be free from unjustified intrusions to the body, *Riggins*, 504 U.S. at 134, 112 S.Ct. 1810, to refuse unwanted medical treatment and to receive sufficient information to exercise these rights intelligently. *White v. Napoleon*, 897 F.2d 103, 111 (3d Cir.1990). Observing that the right to refuse unwanted treatment is useless without knowledge of the proposed treatment, the Third Circuit held in *Napoleon* that convicted federal prisoners have a constitutional right to information—about the diagnosis, proposed treatment, its benefits and side effects and viable alternative treatments available in the prison setting—as is reasonably necessary to make a rational decision to accept or reject proposed medical treatment. *Id.* at 113.[10]

■ [6] Benson, a pretrial detainee, enjoyed at least the same rights as a convicted prisoner. *See Riggins*, 504 U.S. at 135, 112 S.Ct. 1810 (noting that "[t]he Fourteenth Amendment affords at least as much protection to persons the State detains for trial [as to convicted prisoners]"); *Bee v. Greaves*, 744 F.2d 1387, 1392–94 (10th Cir.1984) (holding that pretrial detainees retain a constitutional liberty interest in avoiding unwanted medication with antipsychotic drugs). Judge Herrick specifically found that Benson did not give informed consent, in that she was not fully informed about the nature, dosage and effects of the medication prescribed for her. Nonetheless, he found she was mentally capable of seeking such information if she wanted it; and she had some personal knowledge of drugs from her own usage (and abuses) as well as from her training as a practical nurse.[11] In light of Benson's education, her prior knowledge of drugs, her prior drug history and the fact that she did not ask for further information regarding the drugs she was taking, we cannot fault the court's conclusion, as far as it goes, that Benson's decision to ingest the drugs was voluntary.

■ It is untenable, however, to assume that an inmate's unquestioning acceptance or failure to refuse the administration of psychotropic medication—without information about the drugs—au-

---

9. In support of her argument, Benson notes that the California Institute of Women, the state prison where she currently is confined, requires a written informed consent form to convey the proper information as a pre-requisite for each administration of psychotropic medications to inmates. As Judge Herrick recognized, "[a]dmittedly, concededly ... the jail protocols are not what they should be, the reporting forms are not what they should be. Informed consent forms would be good things to have."

10. This information is akin to the main components of the general doctrine of informed consent as statutorily mandated for medical practitioners in most states: diagnosis of condition, nature and purpose of the treatment, description of anticipated benefits and risks and alternative treatments (including no treatment) and their related risks. Jeanette Y. Wick & Guido R. Zanni, *Informed Consent: What Every Pharmacist Should Know*, 41 J. Am. Pharmaceutical Ass'n 523, 524 (2001); *Making Health Care Decisions*, 3 Ethical and Legal Implications of Informed Consent in the Patient Practitioner Relationship 191, 195 (1982).

11. As Judge Herrick noted, Benson's history of illicit and prescription drug use provided her with knowledge of various medications and the "recognition of the effect[s] of [those] drugs." With the exception of Vistaril, Benson previously had taken all the medications given to her during her trial. Upon returning to custody after having been released on bail for the second time—and being out from under the influence of the medications—Benson promptly requested to be medicated again with the same supposedly "mind-numbing" cocktail of drugs she previously had taken.

tomatically forecloses a finding of involuntariness. There are surely instances where the very treatment at issue—especially one involving drugs that chemically alter the brain—might render the inmate mentally incapable of refusing treatment. In the case of a pretrial detainee, such a drug-induced disability could not only impair her ability to object to further medication but also interfere with her ability to participate in a full and fair trial. Thus the right to information recognized in *Napoleon* is a reasonable application of Supreme Court precedent that would plainly extend to a pre-trial detainee like Benson. That said, we cannot say Judge Herrick erred in concluding that Benson failed to demonstrate that her drug regimen rendered her incapable of refusing her medications or asking for more information about them.

Even accepting Judge Herrick's own acknowledgment that the "mind numbing drugs" had a "significant ... negative ... very unpleasant" effect on Benson, the record supports his finding that Benson was competent and in control of her behavior. Benson concedes that while she was in custody before and during her trial, she initiated 90 legible, understandable and specific requests for medical attention and drugs. She was aware of and utilized her capacity to refuse medication on three occasions, for reasons unrelated to any objections to the medication itself. Thus, she was clearly aware she could have objected to medication during trial—or asked for information about the nature or dosage of particular drugs. Moreover, upon our independent review of Benson's trial testimony and the evidentiary hearing testimony of key participants in Benson's trial, we agree with Judge Herrick's finding that

Benson was capable of logical thought and cogent expression sufficient to refuse treatment or to ask for more information before she took the drugs; in this context, the jail staff had no affirmative duty to volunteer information about the drugs.

## C. Prejudice

■ Even were we to assume that Benson had been medicated without her informed consent, she has not suffered any prejudice. She fails to establish that her constitutional trial rights—including the right to participate in her own defense— were affected or undermined by the challenged medication. As Judge Herrick found, and as the record reflects, Benson had at least a minimum rational understanding of the trial proceedings—and the ability rationally and coherently to participate in them. Neither defense counsel nor the prosecution raised any issues concerning Benson's competence to stand trial or to participate meaningfully in the process. Their evidentiary hearing testimony did not corroborate the observations of corrections officer Katie Folk and alcohol counselor Sharon Stevens regarding Benson's alleged impairment. Defense counsel recalled no unusual demeanor or physical incapacity that caused him to be concerned about Benson's competency; he even called her to testify in her own defense— the quintessential act of participating in one's own trial. The prosecutor testified that he never observed Benson engage in any unusual or inappropriate behavior that would create doubts about her competency to stand trial. The bailiff, charged with monitoring the courtroom and the defendant, did not observe any violent, bizarre or irregular behavior other than one crying outburst that he immediately brought to the court's attention.[12] Furthermore,

---

**12.** Judge Herrick concluded: "If she were in such a condition, if she were disabled to the

point of lack of cognitive ability, incapable of consenting or refusing, seeing critters on the

Benson's lengthy, logical and cogent trial testimony reflects a sufficient ability to understand the proceedings and to assist in her own defense.[13] Benson's detailed trial recollection is inconsistent with someone who claims that she suffered extreme hallucinations and severe cognitive impairment.[14]

We hold that Benson is not entitled to habeas relief because Judge Herrick did not apply *Riggins* or fail to extend the doctrine of informed consent to Benson's situation in a way that is objectively unreasonable. Benson has failed to establish that she was in any way incompetent or incapable of knowingly and intelligently taking the prescribed drugs or that she was subjected to any type of coercion by jail officials. Furthermore, she has not shown that the administration of the medications somehow interfered with any due process or trial rights.

## CONCLUSION

For the reasons stated, we affirm the district court's denial of Benson's habeas petition.

**AFFIRMED.**

---

prosecutor's jacket during the trial, it's unfathomable to me that somebody would not have recognized that she was overtly, actively psychotic, that her lawyer wouldn't have seen it, that her mental health workers wouldn't have seen it, that the district attorney wouldn't have seen it, that the judge wouldn't have seen it, that the bailiff wouldn't have seen it, that the nurse practitioner wouldn't have seen it."

13. During direct and cross-examination, Benson's testimony consisted of complete sentences, clear and substantively focused responses and fairly detailed recollections of the events. She made rational, self-serving statements regarding her lack of malicious intent and her good faith attempts to ameliorate the

"accidental" shooting of Wright. She correctly defined words to clarify her understanding of some questions, made appropriate gestures in accordance with her responses and actively participated in marking up the exhibits to recreate the murder scene.

14. Judge Herrick found "that the defendant's trial testimony as reported in the transcript is the clearest evidence that there can be, as to which portrait of the defendant is the correct one, is the accurate one.... And it appears to me that there are a hundred pages of evidence of [ ] logical, cognitive, cogent, appropriate testimony, often self-serving testimony ...."