Richard Craig **KESSER**, Petitioner–Appellant,

v.

Steven J. **CAMBRA**, Jr., Warden, Respondent–Appellee.

No. 02–15475.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 11, 2002.

Withdrawn from Submission Dec. 9, 2002.

Resubmitted April 3, 2003.*

Filed Dec. 16, 2004.**

---

\* This appeal was withdrawn from submission pending the United States Supreme Court's decision in *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). This Opinion was circulated to the panel on October 23, 2003.

\*\* Decided and filed together with the companion case of *Leahy v. Farmon*, No. 01–17467, 115 Fed.Appx. 403, 2004 WL 2912817 (9th Cir.2004) (unpublished disposition).

William Weiner, San Francisco, CA, for the petitioner-appellant.

Bill Lockyer, Attorney General of the State of California; Robert R. Anderson, Chief Assistant Attorney General; Gerald A. Engler, Senior Assistant Attorney General; Peggy S. Ruffra, Supervising Deputy Attorney General; Michael E. Banister, Deputy Attorney General, San Francisco, CA, for the respondent-appellee.

Appeal from the United States District Court for the Northern District of California; Phyllis J. Hamilton, District Judge, Presiding. D.C. No. CV–96–03452–PJH.

Before: BALDOCK,*** KLEINFELD, and RAWLINSON, Circuit Judges.

BALDOCK, Senior Circuit Judge:

The Equal Protection Clause of the United States Constitution prohibits purposeful discrimination in jury selection against members of a cognizable group. *Batson v. Kentucky,* 476 U.S. 79, 88, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In *Batson,* a racial discrimination case, the Supreme Court established a three-part test for determining whether a prosecutor's use of peremptory challenges to exclude veniremembers of a cognizable group violates the Equal Protection Clause.

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Miller–El v. Cockrell,* 537 U.S. 322, 328–29, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (citing *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712) (internal citations omitted).

In this appeal, we address a *Batson*-related question in the context of habeas corpus review: Whether the state appellate court erred in undertaking a "mixed motive" analysis to uphold the constitutionality of three peremptory challenges, when the state prosecutor offered ethnic-neutral reasons for exercising those challenges against three Native American veniremembers, together with an ethnic-based reason for challenging one of those veniremembers. Applying AEDPA's deferential standard of review,[1] we hold the state court's "mixed motive" analysis was not contrary to or a clear misapplication of *Batson.*

I.

Petitioner Richard Kesser and his co-defendants, Jennifer Leahy and Stephen Chiara, were each convicted in California state court of first degree murder with special circumstances and sentenced to life imprisonment without the possibility of parole. *See* Cal.Penal Code §§ 187(a), 190.2(a)(1), (a)(15). A recitation of the facts leading to Petitioner's arrest and conviction is unnecessary. In sum, Petitioner plotted with Leahy, his fiancée, to hire Chiara to murder Petitioner's former wife Mary. Chiara murdered Mary and Petitioner unsuccessfully attempted to collect the proceeds from Mary's life insurance policy.

During jury selection, the state prosecutor exercised a peremptory challenge to excuse veniremember Debra Rindels, a Native American. The prosecutor similarly exercised peremptory challenges against possible alternate jurors Theresa Lawton and Carla Smithfield, both Native Americans. Petitioner timely objected that the prosecutor had removed every Native American from the venire in violation of the Equal Protection Clause's proscription against "purposeful discrimination" in jury selection. *See Powers v. Ohio,* 499 U.S. 400, 402, 111 S.Ct. 1364, 113 L.Ed.2d 411

***

*** The Honorable Bobby R. Baldock, Senior United States Court of Appeals Judge for the Tenth Circuit, sitting by designation.

1. Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, § 104, 110 Stat. 1214, 1218 (1996) (amendments to 28 U.S.C. § 2254). AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

(1991) (holding that criminal defendant may object to group-based exclusion of jurors regardless of whether defendant is a member of the group). The state trial court agreed and asked the prosecutor to explain his reasons for striking those veniremembers.

The prosecutor first indicated that he considered certain general factors in rating potential jurors from A to F, or best to worst. The factors the prosecutor considered included (1) bias against law enforcement, (2) willingness to return a guilty verdict, (3) ability to listen to the prosecutor, (4) bond with the defense attorney, and (5) ability to work with other jurors. The prosecutor stated: "There really is no rhyme or reason to the use of the peremptory challenge. These are general categories. Sometimes they will apply and sometimes they won't apply."

The prosecutor then turned to his specific reasons for challenging each Native American veniremember. The prosecutor offered entirely ethnic-neutral reasons for his peremptory challenges against Lawton and Smithfield. Lawton was a Native American female employed as a hospital cook. The prosecutor graded her a "C minus" based on her responses to the voir dire. The reasons for Lawton's low grade were: (1) her husband had been divorced and ordered to pay child support, (2) she had been convicted of driving under the influence seven years prior, (3) she was familiar with a high profile murder case in which Petitioner's defense counsel had obtained an acquittal for a client, (4) she had a hazardous commute in winter, and (5) she was hesitant to serve as a juror. Similarly, the prosecutor graded Smithfield a "C to a C minus" because: (1) her husband was a recovering alcoholic as were Defendants Kesser and Leahy, (2) her husband had recently had a stroke and needed support, and (3) she attended a hardship

hearing and wrote the court a letter regarding the difficulties involved in missing work.

As to veniremember Rindels, the prosecutor offered multiple ethnic-neutral reasons together with an ethnic-based reason:

> Miss Rindels was the one darker skinned female from the regular panel or the group of seventeen that I challenged. . . . Miss Rindels my notes indicate—the grade I gave her was a C. She was a younger, middle-aged Native American female . . . . She came to the July 29th hardship [hearing]. She claimed a hardship because she was in the process of completing an application for HUD funding, which was very important I guess to her, and she was the office manager for an Indian tribe and had been for twelve years. Married fourteen years. Her husband was a foreman for a roofing company, two kids, eighteen and twelve . . . . Her younger sister had been divorced, it was a particularly messy divorce. [Rindels' older daughter] had been involved with the criminal justice system . . . . The suspect in that case was [Rindels'] actual father who did a very short period of time apparently in custody . . . . Still a bit emotional and misty. She teared up when she talked about the experience involving her daughter and her father . . . . She works for the tribe, and when we talk about Native Americans in Humboldt County, we're talking essentially about two tribes or separate nations, the Hupa and Yurok.

> My experience is that Native Americans who are employed by the tribe are a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system, and my experience is that they are sometimes resistive of the criminal jus-

tice system generally and somewhat suspicious of the system.

She was pretentious in my mind and self-important with the thought that only she could complete the necessary paperwork which would get the grant. She was emotional about the system as I indicated before. Her daughter had been molested by her father, and for that reason I'm assuming that the living situation was indicative of something of a dysfunctional family. I viewed her as somewhat unstable, fairly weak, and somebody who I thought would be easily swayed by the defense.

Petitioner's trial counsel responded:

Your Honor, I believe that the expressed concern that [the prosecutor] had, particularly Miss Rindels, is a classic example of what the Court—in fact would be used by the appellate courts as a basis for [reversal], because it's a presumption of a group bias based on a stereotype membership in a racial group
. . . .

[The prosecutor expressed the view that] Native Americans that work for tribes are a little more prone to identify with the culture of the tribe, and feel alienated and are not willing to accept the—what is perceived to be the wide judicial system and the ethics and the legal requirements that are imposed on them by that system. That is a stereotype that is placed upon that lady because she happens to be an Indian and a member of the tribe. That's exactly what it says as far as—that's what I heard him say, and I think that would be pegged by the appellate courts as being exactly the type of impermissible stereotyping that makes that type of peremptory [challenge] unconstitutional.

Ultimately, the trial court found "sufficient justification to support the peremptory challenges," and overruled Petitioner's

*Batson* objection. As to veniremember Rindels, the court reasoned: "[M]y understanding of what [the prosecutor] said is that—one of [the reasons] is at least that she worked for the tribe, not because she was one of the tribe, but she worked for the tribe. That's entirely different . . . ."

Petitioner and his co-defendants appealed to the California Court of Appeal. The court upheld the prosecutor's exercise of peremptory challenges against the three Native Americans and affirmed defendants' convictions. *People v. Chiara*, No. 93DA1422 (Cal. Ct.App., filed Dec. 12, 1995) (unpublished disposition). The state appeal court first concluded that Petitioner had established a prima facie case of ethnic bias in jury selection as required under *Batson's* first step: "The trial judge's finding that there had been an exclusion of an identifiable group, i.e. Native Americans, coupled with his request for a statement of reasons from the prosecutor, constituted an implied finding that a prima facie case [of purposeful discrimination in jury selection] had been made." *Id.* at 17. Moving to *Batson's* second and third steps, the state appeal court next addressed the prosecutor's comments regarding veniremember Rindels' membership in the tribe:

All three defendants have pounced on the [prosecutor's] comments as demonstrating that the prosecutor's disqualification of Rindels was based on ethnic bias. They point out, not without justification, that the underlying assumption that Native Americans as a group are "anti-establishment" is itself based on racial stereotype.

Were this the only or primary reason given by the prosecutor, we would have some cause for concern. However, the prosecutor gave many more reasons for his evaluation of Mrs. Rindels as a poor juror other than the statement cited. Specifically, he noted: "She was preten-

tious in my mind and self-important with the thought that only she could complete the necessary paperwork which would get the grant. She was *emotional about the system* as I indicated before. Her daughter had been molested by her father, and for that reason I'm assuming that the living situation was indicative of something of a dysfunctional family. I viewed her as somewhat unstable, fairly weak and somebody who I thought would be easily swayed by the defense.["] (Italics added).

These reasons are race-neutral.... They are based on individual predilections supported by the record. None of them constitutes a sham excuse or can be construed as an effort to disguise group bias. Since the trial court could reasonably have found, based on several race-neutral explanations, that the prosecutor's "predominant motive" in excluding juror Rindels was not ethnic or racial bias, its denial of the *Wheeler* challenge may not be disturbed.[2]

*Id.* at 19–20 (internal citations and footnotes omitted).

The state appeal court also addressed the prosecutor's challenges of Lawton and Smithfield. The court reiterated the prosecutor's reasons for challenging Lawton and concluded: "These are solid reasons, reasonably relevant to the particular case on trial .... We have no problem upholding the trial court's ruling in this regard." *Id.* at 21 (internal quotation and citation omitted). Likewise, the court found the

prosecution offered reasonable justification for challenging Smithfield:

[The prosecutor] noted that [Smithfield's] husband was a recovering alcoholic and therefore she might form an empathy with defendants Kesser and Leahy, both of whom were recovering alcoholics. Although this was not the only reason given, it is a powerful reason, and one which alone justifies the exercise of a peremptory challenge against Smithfield.

*Id.* at 20 (footnote omitted). The California Supreme Court denied review. *People v. Chiara,* Nos. A060502, S051306 (Cal., filed March 14, 1996).

Petitioner next petitioned the United States District Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[3] Among other things, Petitioner again asserted a *Batson* violation. *Kesser v. Cambra,* 2001 WL 1352607, at *1 (N.D.Cal. 2001) (unpublished disposition). The district court first concluded the state trial court erred at step two of *Batson* "in failing to recognize the bias inherent in one of the prosecutor's purportedly neutral reasons" for challenging veniremember Rindels. *Id.* at *3. The court, however, rejected Petitioner's argument that the prosecutor's single "non-race-neutral reason" for challenging Rindels constituted a constitutional error per se. The district court explained that to succeed on his legal argument—

[P]etitioner must show that the state court decision "was contrary to, or in-

---

2. A *Wheeler* challenge is California's functional equivalent of a *Batson* challenge. *See People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978). Although the respective decisions expound largely the same test for reviewing equal protection challenges to jury selection, *Batson's* federal constitutional standards control our disposition of this case. *See Lewis v. Lewis,* 321 F.3d 824, 827 & n. 5 (9th Cir.2003).

3. Section 2254 provides that a Federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

volved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). The decision of the [state appeal court] that the second step of the *Batson* analysis can be met by articulating both race-based and race-neutral reasons for a strike, is not contrary to or an unreasonable application of, United States Supreme Court precedent. That is, there is no United States Supreme Court authority holding that articulation of one race-based reason for a strike, along with several race-neutral reasons, requires reversal at the second *Batson* step.

*Id.* at *9.

Turning to step three of the *Batson* test, the district court considered whether Petitioner had carried his burden of proving "purposeful discrimination," i.e., that the prosecutor's facially neutral reasons for his challenges were pretextual. The district court concluded Petitioner had failed to carry his burden. According to the district court, the state appeal court's finding that the prosecutor's "predominant motive" in striking veniremember Rindels was ethnic-neutral constituted "a *Batson* third-step finding that the prosecutor was not motivated by discriminatory intent and was not an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding' " *Id.* at *11 (quoting 28 U.S.C. § 2254(d)(2)).

The district court denied the petition and granted Petitioner a Certificate of Appealability on "the issue of whether the prosecution's use of peremptory challenges in his case was unconstitutional." *See* 28 U.S.C. § 2253(c).

## II.

At the outset, the State acknowledges Petitioner established a prima facie case of purposeful discrimination in the state trial court. The prosecutor indisputably exercised peremptory challenges to exclude three Native Americans—members of a cognizable ethnic group—from the venire. Once the trial court directed the prosecutor to explain his challenges and he did so, the issue of whether Petitioner made a prima facie showing became moot. *See Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality). Thus, we begin our analysis with *Batson's* second step, i.e., the prosecutor's explanation for striking the three Native American veniremembers.

### A.

■■■ Once Petitioner established a prima facie case of discrimination, the burden of production shifted to the prosecutor to articulate a facially-valid neutral explanation for the strikes. *See Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Whether the prosecutor's explanation for striking the three Native American veniremembers satisfied *Batson's* second step is a question of law. *Tolbert v. Page*, 182 F.3d 677, 680 n. 5 (9th Cir.1999) (en banc) (citing *Hernandez*, 500 U.S. at 359, 111 S.Ct. 1859). In resolving this question, we look to the last reasoned decision of the state court— the California Court of Appeal's decision— as the basis of the state court's judgment. *See Benson v. Terhune*, 304 F.3d 874, 880 n. 5 (9th Cir.2002).

AEDPA directs us to afford the state appeal court's legal judgment considerable deference. *Cf. Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (reversing federal court decision for exceeding AEDPA's limits). In reviewing questions of law, we may not grant a habeas petition challenging a conviction on the basis of a claim reviewed on the merits in

state court (as the *Batson* issue was in this case) unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1).

### 1.

■ The Supreme Court has not addressed *Batson's* application in a case where a prosecutor tenders both group-related and group-neutral reasons for a peremptory challenge. Petitioner therefore acknowledges that the California Court of Appeal's second step analysis was not "contrary to ... clearly established Federal law, as determined by the Supreme Court[.]" *See Williams v. Taylor*, 529 U.S. 362, 405–06, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (*Williams I* ).[4] Instead, we focus on whether the state appeal court's decision to proceed to *Batson's* third step once the prosecutor offered both an ethnic-based and ethnic-neutral reasons for his strikes "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court[.]"

■ Generally, the task of discerning what the Supreme Court has clearly established will be "straightforward." *Lockyer v. Andrade*, 538 U.S. 63, 74–75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The phrase "clearly established Federal law, as determined by the Supreme Court" "refers to the holdings, as opposed to the dicta, of

... [Supreme] Court[ ] decisions as of the time of the relevant state-court decision." *Williams I*, 529 U.S. at 412, 120 S.Ct. 1495. We may still look to Ninth Circuit law for its persuasive authority in applying Supreme Court law. But only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 1999).

Under AEDPA's "unreasonable application" clause, we must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams I*, 529 U.S. at 409, 120 S.Ct. 1495. The Court emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application . of federal law." *Id.* at 410, 120 S.Ct. 1495. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411, 120 S.Ct. 1495; *see also Lockyer*, 538 U.S. at 74–75, 123 S.Ct. 1166; *Bell v. Cone*, 535 U.S. 685, 698–99, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).[5] We may not overturn a state conviction solely because we may have decided the case differently in the first instance. *See Duhaime*, 200 F.3d at 600.

Instead, "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle

---

4. In *Williams I*, the Court explained that a state court decision is "contrary to" Supreme Court authority only if "the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." 529 U.S. at 413, 120 S.Ct. 1495.

5. In *Van Tran v. Lindsey*, 212 F.3d 1143, 1153–54 (9th Cir.2000), we relied on the concept of "clear error" to restate the *Williams I* standard. *Lockyer*, 123 S.Ct. at 1174–75, overruled *Van Tran*. *See Hall v. Director of Corr.*, 343 F.3d 976, 985–86 (9th Cir.2003) (Tallman, J., dissenting).

from ... [Supreme] Court[ ] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams I*, 529 U.S. at 413, 120 S.Ct. 1495; *accord Lockyer*, 538 U.S. at 75, 123 S.Ct. 1166. A state court decision might also involve an unreasonable application of Supreme Court precedent "if the state court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams I*, 529 U.S. at 407, 120 S.Ct. 1495.

### 2.

■ In this case, the Supreme Court's governing legal principles are undisputed. *See Lockyer*, 538 U.S. at 71, 123 S.Ct. 1166. Beginning with *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879), the Supreme Court has consistently endorsed the constitutional principal that purposeful and deliberate discrimination against cognizable minorities in the jury selection process violates the Equal Protection Clause of the Fourteenth Amendment. *See, e.g., Georgia v. McCollum*, 505 U.S. 42, 46–48, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *Batson*, 476 U.S. at 84 & n. 3, 106 S.Ct. 1712 (collecting cases). In *Batson*, the Court set forth an evidentiary framework for reviewing such constitutional claims. *Id.* at 96–98, 106 S.Ct. 1712. At the time of the state appeal court's decision in December 1995, *Batson's* three-step evidentiary framework was well-ingrained in equal protection jurisprudence. By employing such framework in its analysis, the state appeal court identified the "clearly established Federal law" governing Petitioner's claim.

The controversy surrounds the state appeal court's decision to proceed to step three of *Batson* despite the prosecutor's

admission that his decision to challenge veniremember Rindels was based on, among other factors, ethnicity. Petitioner insists the prosecutor's single ethnic-based reason for exercising a peremptory challenge against Rindels violates the Equal Protection Clause, and thus precludes a step two finding that the prosecutor tendered an ethnic-neutral explanation. According to Petitioner, reversal is required because the prosecutor provided an ethnic-based reason for challenging Rindels at step two of the *Batson* framework. Therefore, any additional group-neutral reasons offered for Rindels' challenge are necessarily pretextual.

### a.

Petitioner's position is that of Justice Marshall and Justice Brennan in their dissent from denial of certiorari in *Wilkerson v. Texas*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989) (Marshall, J., dissenting from denial of cert.). *Wilkerson* involved "mixed prosecutorial motives" in challenging African–American jurors. Citing "*Batson's* unqualified requirement that the state offer 'a *neutral* explanation' for its peremptory challenge," Justice Marshall suggested that "[t]o be 'neutral,' the explanation must be based *wholly* on non-racial criteria." *Id.* at 926, 110 S.Ct. 292. Justice Marshall opined: "A judicial inquiry designed to safeguard a criminal defendant's basic constitutional rights should not rest on the unverifiable assertions of a prosecutor who, having admitted to racial bias, subsequently attempts to reconstruct what his thought process would have been had he not entertained such bias." *Id.* at 927–28, 110 S.Ct. 292.

Unfortunately for Petitioner, Justice Marshall's dissent remains just that—a dissent. The Supreme Court has not endorsed Justice Marshall's view that mixed motive analysis does not fit within *Bat-*

*son's* evidentiary framework. To date, the Court has provided no indication it might do so. In *Batson*, the Court specifically "decline[d] ... to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Batson*, 476 U.S. at 99, 106 S.Ct. 1712. Instead, the Court left evidentiary questions surrounding *Batson's* framework to percolate in the lower courts.[6]

And percolate they have. Beginning with the Second Circuit's decision in *Howard v. Senkowski*, 986 F.2d 24 (2d Cir. 1993) (upholding "dual motivation" analysis of New York state court), the Circuit Courts confronted with the issue have uniformly endorsed mixed motive analysis in the *Batson* context and explained that peremptory challenges based on both discriminatory and nondiscriminatory reasons do not necessarily rise to the level of a *Batson* violation. *See Gattis v. Snyder*, 278 F.3d 222, 232–35 (3d Cir.2002) (upholding mixed motive analysis of Delaware state court); *Weaver v. Bowersox*, 241 F.3d 1024, 1032 (8th Cir.2001) (recognizing Missouri state court's dual motivation analysis as consistent with *Batson*); *United States v. Tokars*, 95 F.3d 1520, 1531–34 (11th Cir.1996) (upholding district court's mixed motive analysis on direct appeal); *Wallace v. Morrison*, 87 F.3d 1271, 1274 (11th Cir. 1996) (upholding dual motivation analysis of Alabama state court); *United States v. Darden*, 70 F.3d 1507, 1530–32 (8th Cir. 1995) (upholding mixed motive analysis on direct appeal); *Jones v. Plaster*, 57 F.3d 417, 420–22 (4th Cir.1995) (remanding for application of mixed motive analysis in civil

context); *see also Holder v. Welborn*, 60 F.3d 383, 390–92 (7th Cir.1995) (Cudahy, J., dissenting in part) (advocating application of mixed motive analysis). To date, only a handful of state courts have rejected mixed motive analysis when confronted with a *Batson* claim. *See, e.g., McCormick v. State*, 803 N.E.2d 1108, 1112–13 (Ind. 2004); *State v. Lucas*, 199 Ariz. 366, 18 P.3d 160, 163 (2001); *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205, 210 (S.C.1998); *Rector v. State*, 213 Ga.App. 450, 444 S.E.2d 862, 865 (Ga.App.1994); *but see Guzman v. State*, 85 S.W.3d 242, 248 n. 17 (Tex.Crim.App.2002) (en banc) (collecting state court decisions employing mixed motive analysis).

Shortly after the Second Circuit's decision in *Howard*, and notably two years prior to the California Court of Appeal's decision in this case, we withheld judgment "on the issue [of] whether a mixed-motive defense in *Batson* jury challenge cases is a valid one." *Johnson v. Vasquez*, 3 F.3d 1327, 1329 n. 3 (9th Cir.1993). We assumed without deciding that the prosecutor had met his burden of production at step two of *Batson* and proceeded to evaluate each of the neutral reasons for the challenge, ultimately rejecting those reasons as pretextual. *But see id.* at 1331–33 (Thompson, J., dissenting) (endorsing mixed motive analysis as set forth in *Howard*).

Six years prior, however, we implicitly approved mixed motive analysis in the *Batson* context. In *United States v. Thompson*, 827 F.2d 1254 (9th Cir.1987), the district court permitted the Government to tender its reasons for challenging

---

6. Mixed motive analysis has its genesis in civil discrimination law and invokes the principal that, where the evidence in a discrimination case establishes the challenged action was based in part on a nondiscriminatory reason and in part on a discriminatory reason, the complainant to prevail must show the discriminatory reason was a primary or predominant factor leading to such action. Otherwise, the challenged action cannot be deemed fairly attributable to improper consideration of a discriminatory purpose. *See, e.g., Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

an African–American juror outside the presence of defense counsel. Remanding for additional *Batson* proceedings, we explained:

> [T]his case illustrates how *apparent Batson* error can result from an unclarified peremptory challenge. Here, the prosecutor excused a black potential juror because "he lived in the defendant's neighborhood—he's black, too, and he was dressed casually, and I thought he might identify with him too much." While part of this explanation might seem appropriately neutral, the fact that the potential juror might identify too much with the defendant because they are of the same race is precisely what *Batson* said was not legitimate. Because the prosecutor's reasons were left unchallenged, she was unable to further explain her reasoning and *perhaps dispel the inference that she acted from improper motives.*

*Id.* at 1260 (emphasis added) (internal brackets, citations, and ellipses omitted). Notably, we declined to reverse defendant's conviction based on his argument that "the transcript reveals that the prosecution used its peremptory challenges in a racially discriminatory way." *Id.* at 1256.

Most recently, we appeared to endorse mixed motive analysis in *Lewis v. Lewis*, 321 F.3d 824 (9th Cir.2003). There, we stated:

> After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should then step back and *evaluate all of the reasons together.* The proffer of various faulty

reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a Batson challenge.

*Id.* at 831 (emphasis added); *see also McClain v. Prunty*, 217 F.3d 1209, 1221 (9th Cir.2000) ("The fact that one or more of a prosecutor's justifications do not hold up under judicial scrutiny *militates against* the sufficiency of a valid reason.") (emphasis added).

While the foregoing *Batson* jurisprudence assists us in resolving the question of whether the California Court of Appeal's application of *Batson* was objectively reasonable in this case, we do not independently adjudge whether mixed motive analysis is appropriate where a prosecutor tenders both ethnic-based and ethnic-neutral reasons for challenging a veniremember. *See Williams I*, 529 U.S. at 411, 120 S.Ct. 1495. AEDPA only requires us to decide whether the state appeal court's decision was an unreasonable application of *Batson's* evidentiary framework. *See Lockyer*, 538 U.S. at 71, 123 S.Ct. 1166.[7]

In *Wilkerson*, Justice Marshall made the argument opposing mixed motive analysis in the *Batson* context. Petitioner makes a similar argument based on decisions which resolved the *Batson* inquiry at step two. Yet those decisions were not decided under AEDPA's deferential standard of review. *See, e.g., United States v. Bishop*, 959 F.2d 820 (9th Cir.1992) (holding on direct appeal that the prosecutor failed to meet his burden to provide a racially-neu-

---

7. The Court in *Lockyer* forcibly made its point:

> The Ninth Circuit requires federal habeas courts to review the state court decision *de novo* before applying the AEDPA standard of review. See, *e.g., Van Tran*, [212 F.3d] at 1154–55 .... We disagree with this approach. AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1)—whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law.

538 U.S. at 71, 123 S.Ct. 1166.

tral explanation for a peremptory challenge). A careful analysis of Supreme Court precedent illustrates why the large majority of courts, including our sister circuits, and the California Court of Appeal in this case, have endorsed mixed motive analysis within *Batson's* evidentiary framework.

b.

In *Swain v. Alabama*, the Court commented that a prosecutor's use of peremptory challenges to exclude minorities from the jury "for reasons *wholly unrelated* to the outcome of the particular case on trial," would be improper. 380 U.S. 202, 224, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), *overruled in part by Batson*, 476 U.S. at 100 n. 25, 106 S.Ct. 1712 (emphasis added). Similarly in *Batson*, 476 U.S. at 80, 106 S.Ct. 1712, the Court stated "the Equal Protection Clause forbids the prosecutor to challenge potential jurors *solely* on account of their race[.]" (emphasis added). These statements are consistent with *Batson's* underlying premise. An equal protection violation occurs if a prosecutor at *Batson's* second step offers "solely" ethnic-based reasons for challenging a juror "wholly unrelated" to the case. We do not read these statements to suggest that an equal protection violation may never occur where

a prosecutor offers both ethnic-based and ethnic-neutral reasons for exercising a challenge. *See Howard*, 986 F.2d at 28. The Supreme Court, however, has never suggested, and certainly not held, that a discriminatory intent is necessarily inherent in a prosecutor's explanation for a challenge where that explanation contains both proper and improper motives. *See Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859 ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.").[8]

*Batson* indicated the question of whether a defendant had met his burden of proving intentional or purposeful discrimination on the part of the state was the same "as in any case alleging a violation of the Equal Protection Clause." 476 U.S. at 90, 106 S.Ct. 1712; *see also id.* at 93, 106 S.Ct. 1712; *Hernandez*, 500 U.S. at 373, 111 S.Ct. 1859 (O'Connor, J., concurring). "In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Batson*, 476 U.S. at 93, 106 S.Ct. 1712 (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). Addressing an equal

---

**8.** In fact, the plurality's discussion in *Hernandez*, 500 U.S. at 360, 111 S.Ct. 1859, suggests the opposite:

> Petitioner argues that Spanish-language ability bears a close relation to ethnicity, and that, as a consequence, it violates the Equal Protection Clause to exercise a peremptory challenge on the ground that a Latino potential juror speaks Spanish. He points to the high correlation between Spanish-language ability and ethnicity in New York where the case was tried. We need not address that argument here, for the prosecutor did not rely on language ability *without more*, but explained that the specific responses and the demeanor of the two individuals during voir dire caused him

to doubt their ability to defer to the official translation of Spanish-speaking testimony. (emphasis added); *see also id.* at 373, 111 S.Ct. 1859 ("Consistent with our established equal protection jurisprudence, a peremptory strike will constitute a *Batson* violation only if the prosecutor struck a juror *because of the juror's race.*") (O'Connor, J., concurring in the judgment). Justice Stevens' argument that the Court erred "in focusing the entire inquiry on the subjective state of mind of the prosecutor[,]" further illustrates the point. *Id.* at 378, 111 S.Ct. 1859. State of mind or intent, of course, is a question of fact, which leads to *Batson's* third step. *See, e.g., Miller–El*, 537 U.S. at 338–40, 123 S.Ct. 1029.

protection claim, the Court in *Arlington Heights* explained mixed motive analysis:

Proof that the decision ... was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted ... the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party ... no longer fairly could attribute the injury complained of to improper consideration of discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision.

429 U.S. at 270 n. 21, 97 S.Ct. 555 (emphasis added); *see also Hernandez*, 500 U.S. at 364, 111 S.Ct. 1859 ("*Batson's* treatment of intent to discriminate ... accords with our treatment of that issue in other equal protection cases.").

In addition to relying on cases involving equal protection claims made in a civil context, *Batson* also relied on Title VII to establish its evidentiary framework. *See Batson*, 476 U.S. at 94 n. 18, 96 n. 19, 98 n. 21, 106 S.Ct. 1712; *see also Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 (*Batson* "also corresponds with our treatment of the intent inquiry under Title VII."); *Tolbert*, 182 F.3d at 686 (McKeown, J., dissenting) ("In *Batson*, the Supreme Court made clear its intent that Title VII ... review standards apply to *Batson* challenges."). In Title VII cases, mixed motive analysis is an established part of the discriminatory intent or purpose inquiry. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality).[9] Notably, in *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 848

(9th Cir.2002) (en banc), we recognized that in *Price Waterhouse* "[a]ll nine justices agreed" that a finding of wrongdoing was appropriate only where the "illegitimate factor" was a "but for" cause of the alleged discrimination.

■ Based on the foregoing, we conclude that the California Court of Appeal's decision to proceed to step three did not constitute "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). The state appeal court properly recognized that, in addition to his ethnic-based reason, the prosecutor in this case tendered facially-valid ethnic-neutral reasons for challenging veniremember Rindels. The court also properly recognized that the prosecutor offered entirely ethnic-neutral reasons for challenging the two Native American alternate veniremembers. While the reason that Rindels was a Native American "employed by the tribe" undoubtedly bears upon the persuasiveness of the prosecutor's ethnic-neutral reasons for challenging the three Native American veniremembers, "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant[.]" *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769. Hence, we turn to the California Court of Appeal's finding that Petitioner failed to carry his burden of proving purposeful discrimination in jury selection. AEDPA again restricts our review.

## B.

■■ In a *Batson* challenge, the "ultimate burden of persuasion" regarding [ethnic] motivation rests with, and never shifts from, the opponent of the strike." *Id. Batson's* third step requires a court to

---

**9.** The Civil Rights Act of 1991 superceded in part the mixed motive analysis set out in *Price*

*Waterhouse. See* 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B).

ask whether a defendant "has carried his burden of proving purposeful discrimination." *Miller–El,* 537 U.S. at 338, 123 S.Ct. 1029 (internal quotations omitted). "[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Id.* "*Batson* requires only that the prosecutor's reason for striking a juror not *be* the juror's race." *Hernandez,* 500 U.S. at 375, 111 S.Ct. 1859 (O'Connor, J., concurring).

■ "[A] state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference[.]" *Miller–El,* 537 U.S. at 339, 123 S.Ct. 1029 (quoting *Hernandez,* 500 U.S. at 364, 111 S.Ct. 1859); *see also Hernandez,* 500 U.S. at 367, 111 S.Ct. 1859 (discrimination in challenging potential jurors "is, as *Batson* recognized, a question of historical fact"). AEDPA embraces this deference. As to questions of fact, we may not grant a habeas petition challenging a conviction on the basis of a claim reviewed on the merits in state court unless the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In a habeas case, the "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

■ That a state appeal court, as opposed to a state trial court, makes the pertinent factual finding does not alter § 2254(e)(1)'s presumption of correctness or a petitioner's burden of proof. *See Bragg v. Galaza,* 242 F.3d 1082, 1087 (9th Cir.2001). Section 2254(d) speaks only in terms of "state courts." "This interest in federalism recognized by Congress in enacting § 2254(d) requires deference by federal courts to factual determinations of all state courts." *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (interpreting an earlier version of § 2254(d) that afforded state court findings a presumption of correctness).

1.

■ The only evidence Petitioner presented in the California state courts to support his claim of purposeful discrimination was (1) the prosecutor's improper reason for challenging Rindels, and (2) the prosecutor's challenge of two additional Native American veniremembers from the alternate panel.[10] While the California Court of Appeal properly expressed concern over the prosecutor's statement that Native Americans were "anti-establishment," the court found the prosecutor's statement was *not* "the only or *primary* reason" for challenging Rindels. *Chiara,* No. 93DA1422, at 19.

The court recognized the prosecutor offered at least four ethnic-neutral reasons for Rindels' challenge: (1) she was "pretentious" and "self-important" especially with regard to her employment (she had

10. Petitioner also complains that the prosecutor improperly excused Flordiliza Nakata, the only Asian American veniremember. The prosecutor, however, offered only valid group-neutral reasons for challenging Nakata. More importantly, as the state appeal court commented: "The trial court did not find that a prima facie case of racial or ethnic bias had been made based on Nakata's disqualification and defendants make no reasoned attempt to show otherwise." *Chiara,* No. 93DA1422, at 18 n. 12. The district court subsequently noted that defendants' petition for review filed with the California Supreme Court raised only the challenges of the Native American jurors, thus leaving any claim of discrimination as to Nakata unexhausted. *Kesser,* 2001 WL 1352607, at *4 n. 3.

attended the hardship hearing), (2) due to past involvement with the criminal justice system, she was "emotional about the system," (3) she was from a "dysfunctional family" based on the fact that her father apparently had molested her daughter, and (4) she was "somewhat unstable." *Id.* The court specifically found these reasons, at least three of which rested upon objective criteria, were "based on individual predilection supported by the record" and "race-neutral." *Id.* at 20. The court further found that none of these . reasons "constitutes a sham excuse or can be construed as an effort to disguise group bias." *Id.* The court concluded the prosecutor's voir dire did not violate the Equal Protection Clause because the " 'predominant motive' in excluding juror Rindels was not ethnic or racial bias[.]" *Id.* The state appeal court's finding that Rindels' ethnicity was not the "predominant motive" for her challenge is the equivalent of a *Batson* third-step finding that the prosecutor would have challenged Rindels regardless of her ethnicity.[11] Consequently, Petitioner failed to establish intentional or purposeful discrimination on the part of the State.

■ Petitioner points out the prosecutor challenged the only three Native Americans on the venire. A court may infer an "invidious discriminatory purpose" from the totality of the relevant facts, including the fact that a prosecutor challenges each member of a cognizable group. *Hernandez,* 500 U.S. at 363, 111 S.Ct. 1859. We are unable to conclude that the California Court of Appeal's finding of historical fact constitutes "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" because of the numerous ethnic-

neutral, objectively-based reasons which the prosecutor proffered for the challenges. 28 U.S.C. § 2254(d)(2); *Cf. Burks v. Borg,* 27 F.3d 1424, 1429 (9th Cir.1994) (explaining that "[w]hile subjective factors may play a legitimate role in the exercise of challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination such as a clear and sustained pattern of strikes against minority jurors").

The state court "could rely on the fact that only three challenged jurors can with confidence be identified as[Native American], and that the prosecutor had a verifiable and legitimate explanation for two of those challenges." *Hernandez,* 500 U.S. at 370, 111 S.Ct. 1859. The state court "took a permissible view of the evidence in crediting the prosecutor's explanation." *Id.* at 369, 111 S.Ct. 1859. The court's factual finding that Petitioner failed to meet his burden under *Batson,* is "presumed to be correct." 28 U.S.C. 2254(e)(1). Petitioner has not presented "clear and convincing evidence" to persuade us that finding is incorrect. *Id.*

2.

■ Petitioner belatedly argues that we should, or direct the district court, to undertake a comparative analysis by comparing the jury questionnaires of unchallenged veniremembers who purportedly suffered the same neutral defects as the three Native American jurors. Petitioner, however, has not provided us with a transcript of the voir dire. Since before Petitioner's trial, we have recognized that a comparative analysis of challenged with unchallenged jurors is a means of exploring the possibility that facially-valid reasons for a challenge are a pretext for

11. *Webster's Third New Int'l Dictionary* 1786 (1981), defines predominant "as having superior strength, influence, authority, or position: CONTROLLING, DOMINATING, PREVAILING . . . ."

discrimination. *See, e.g., United States v. Chinchilla*, 874 F.2d 695, 698–99 (9th Cir. 1989). Yet Petitioner did not seek a comparative analysis in the state trial court or ask the state appeal court to remand for such an analysis. *See People v. Johnson*, 47 Cal.3d 1194, 255 Cal.Rptr. 569, 767 P.2d 1047, 1056–57 (Cal.1989) (endorsing comparative analysis in the trial court but restricting it on appeal to a deferential review of trial court findings).[12]

 Petitioner does not suggest that he was unable to develop the factual predicate for comparative analysis in the state trial court. Rather, Petitioner simply "failed to develop the factual basis of his claim in State court proceedings." 28 U.S.C. § 2254(e)(2); *compare, Miller–El*, 537 U.S. at 331–334, 343–44, 123 S.Ct. 1029 (endorsing comparative analysis).[13] In *Williams v. Taylor*, 529 U.S. 420, 433, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000) (*Williams II*), the Court emphasized that under AEDPA "prisoners who are at fault for the deficiency in the state-court record must satisfy a heightened standard to obtain an 'evidentiary hearing' " in federal court. The threshold standard is one of diligence. *Id.* at 434, 120 S.Ct. 1495.

Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law .... For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record .... If the prisoner fails to do so, himself ... contributing to the absence of a full and fair adjudication in state court, § 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met. Federal courts sitting in habeas are not an alternative forum for trying facts ... which a prisoner made insufficient effort to pursue in state proceedings.

*Id.* at 437, 120 S.Ct. 1479.[14]

In this case, the district court noted the evidence in the record to support Petitioner's comparative approach was insufficient to overcome AEDPA's presumption of correctness. *Kesser*, 2001 WL 1352607, at *12. For the reasons stated, we need not reach that question. Suffice it to say the California Court of Appeal's finding that Petitioner failed to carry his burden of

---

12. In *Johnson*, the California Supreme Court explained why comparative analysis in the trial court was preferable to comparative analysis on appeal: "It should be apparent ... that the very dynamics of the jury selection process make it difficult, if not impossible, on a cold record, to evaluate or compare the peremptory challenge of one juror with the retention or another juror which on paper appears to be substantially similar." 255 Cal. Rptr. 569, 767 P.2d at 1057.

13. Unlike the record before the Supreme Court in *Miller–El*, none of the reviewing courts in this case have had the benefit of a record of testimony, arguments, and findings based on a comparative analysis of challenged and unchallenged jurors. *See Miller–El*, 537 U.S. at 331–34, 123 S.Ct. 1029.

14. Section 2254(e)(2) provides that a federal court shall not hold an evidentiary hearing if a petitioner has "failed to develop the factual basis of a claim in State court proceedings," unless—

(A) the claim relies on—
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; *and*
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).

proving discriminatory intent or purpose is not "an unreasonable determination of facts *in light of the evidence presented in the State court proceeding.*" 28 U.S.C. § 2254(d)(2) (emphasis added).

### III.

Congress' avowed purpose in enacting AEDPA was "to further the principles of comity, finality, and federalism." *Duncan v. Walker,* 533 U.S. 167, 178, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation omitted). Our opinion is necessarily consistent with that aim and our oath to enforce the law as written. *See Clark v. Murphy,* 331 F.3d 1062, 1067 (9th Cir. 2003). Through AEDPA, Congress has constrained the power of inferior federal courts to grant a state prisoner a writ of habeas corpus where a state court has adjudicated the prisoner's claims on the merits. Because the California Court of Appeal's decision rejecting Petitioner's *Batson* challenge constitutes neither an "unreasonable application of, clearly established, Federal law," nor an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding[,]" the judgment of the district court denying Petitioner a Writ of Habeas Corpus is

AFFIRMED.

RAWLINSON, Circuit Judge, dissenting.

After the United States Supreme Court's ruling in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), no prosecutor worth his salt is going to come right out and say: "The defendant in this case is Native American. I do not want any Native Americans on the

jury because Native American jurors might be more reluctant to convict Native American defendants." The prosecutor in this case came as close to this admission as we are likely ever to see. Not only did he use his peremptory challenges to exclude every prospective Native American juror, he candidly admitted that his decision was driven by the race of the prospective jurors.

To understand the magnitude of the prosecutor's actions, it is important to consider the sequence of events leading to the defense's *Wheeler* challenge.[1]

The trial court identified three Native American prospective jurors who were peremptorily challenged by the prosecution: Ms. Rindels, Ms. Lawton and Ms. Smithfield.

The prosecutor gave the following explanation for excusing Ms. Rindels from the jury panel:

My experience is the [N]ative Americans who are employed by the tribe are a little more prone to associate themselves with the culture and beliefs of the tribe than they are with the mainstream system, and my experience is that they are sometimes resistive of the criminal justice system generally and somewhat suspicious of the system.

She was pretentious in my mind and self-important with the thought that only she could complete the necessary paperwork which would get the grant. She was emotional about the system as I indicated before. Her daughter had been molested by her father, and for that reason I'm assuming that the living situation was indicative of something of a dysfunctional family. I viewed her as somewhat unstable, fairly weak, and

---

1. As note 2 of the majority opinion explains, a *Wheeler* challenge is the state law equivalent of a challenge under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

somebody who I thought would be easily swayed by the defense.

As to prospective juror Lawton, the prosecutor responded:

She would be commuting from the Willow Creek area. We're going into the winter. That sometimes is [a] fairly hazardous commute, although she had been commuting from where she lived to Trinity County and Weaverville and that is equally hazardous, but sometimes the road is closed, and that sometimes can affect our ability to go forward, and there is a certain flow to the proceedings that I frankly don't like to see disrupted if I can help it.

The prosecutor justified his challenge to Ms. Smithfield with the following explanation:

She also was the individual who wrote a letter to the Court to reemphasize how important she thought her position was and how important that she thought it was that she be there.

Now, I know we've had an awful lot of people who've talked about that, and we've had an awful lot of teachers, in fact I can't think of one teacher who didn't think they were pretty important and needed to be at their school, but we've got teachers on the panel, but she seemed overly concerned with that, took the time to sit down and write another letter to the Court about that, and for those reasons I didn't think that she was an appropriate juror in this case.

The prosecutor also expressed a stereotypical view of Native Americans by making the following remarks:

[I]n this county we've had Dr. Roy Alsop come in here and explain to the courts and I've seen this on the criminal calendar, child molesting is okay in certain [N]ative American cultures, and we can't

treat [N]ative American child molesters the same way we treat other child molesters, and have to treat them through the [I]ndian culture center and there are a whole bunch of people that violate our laws that are [N]ative Americans and they go much more often through the [N]ative American system than the criminal system, and to say that does not exist is frankly incorrect.

Although this case had absolutely nothing to do with child molesting, the prosecutor took great pains to inform the court that, at least in his view, the Native American culture is at odds with the criminal justice system.

Against this factual backdrop, we must examine whether the California Court of Appeal's ruling upholding the denial of the defendants' *Wheeler/Batson* motions was an unreasonable determination of the facts. *See McClain v. Prunty,* 217 F.3d 1209, 1224 (9th Cir.2000).

After culling out the "race-neutral" reasons articulated by the prosecutor, the California Court of Appeal ruled that these reasons were sufficient to defeat the defendant's *Wheeler/Batson* claim.

The California Court of Appeal recognized that once the defendant has established a *prima facie* case of a pattern of race-based peremptory challenges, the burden shifts to the prosecution to provide race-neutral explanations for the exercise of the peremptory challenges at issue. However, contrary to the implied holding of the California Court of Appeal, the analysis does not end there.

The majority opinion fills in the analysis that was not performed by the California Court of Appeal. In doing so, the majority frames the issue as "[w]hether the state appellate court erred in undertaking a

'mixed motive' analysis [2] to uphold the constitutionality of three peremptory challenges, when the state prosecutor offered ethnic-neutral reasons for exercising those challenges against three Native American veniremembers, together with an ethnic-based reason for challenging one of those veniremembers." [3] Majority Opinion at 17005. Unfortunately for the viability of the majority ruling, the California Court of Appeal simply did not apply a mixed motives analysis.

In assessing the Court of Appeal's ruling, we must remain mindful of the reason for the analysis: to fulfill our obligation to provide a jury free from bias against any particular ethnic group. The United States Supreme Court said as much in *Batson*.

In *Batson*, the Court reminded us that "[m]ore than a century ago, the Court decided that the State denies a ... defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded. That decision laid the foundation for the Court's unceasing efforts to eradicate racial discrimination in the [jury selection] procedures ..." *Batson*, 476

U.S. at 85, 106 S.Ct. 1712 (citation omitted).

The Supreme Court acknowledged that "[b]y compromising the representative quality of the jury, discriminatory selection procedures make juries ready weapons for officials to oppress those accused individuals who by chance are numbered among unpopular or inarticulate minorities." *Id.* at 87 n. 8, 106 S.Ct. 1712 (citation and internal quotation marks omitted).

In *Batson*, our highest court specified that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that [those] jurors as a group will be unable impartially to consider the State's case against a[defendant from the same ethnic group]." *Id.* at 89, 106 S.Ct. 1712. Yet that is precisely what the prosecutor did in this case when he smeared an entire race of people, expressly assuming that Native American people are unwilling to adhere to "our laws," and thereby implying that they are unfit for jury duty. In fact, the prosecutor's actions spoke even louder than his words: he excised every single Native American from the jury pool, leaving an "inexorable zero" sum total of Native American jurors.[4]

2. In a ruling of first impression, the majority holds that the mixed motives rubric commonly used in Title VII cases should be imported into the *Batson* inquiry when *prima facie* race-based peremptory challenges are also attributed to race-neutral reasons. Op. at 339–40. Assuming, without deciding, that a mixed motives analysis applies, the California Court of Appeal did not conform its ruling to that rubric.

3. I also take issue with the stated notion that only one of the Native American prospective jurors was challenged for an ethnic-based reason. The prosecutor's statements regarding the Native American culture's disregard for "our laws" pervaded the exercise of his peremptory challenges against Native Americans. Even the California Court of Appeal acknowl-

edged that such an "impermissible group bias" runs afoul of the federal Constitution.

4. As the majority opinion recognizes, at least implicitly, courts considering *Batson* issues often analogize to cases under Title VII of the Civil Rights Act. *See Batson*, 476 U.S. at 94 and n. 18, 106 S.Ct. 1712. *See also Howard v. Senkowski*, 986 F.2d 24, 27 and n. 2 (2d Cir.1993), a case mentioned prominently in the majority opinion; *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987). Mixed motives analysis is frequently utilized in deciding cases brought under Title VII. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 660 (5th Cir.1983), the court explained the impetus for the passage of Title VII. "It is now well recognized that employment deci-

In resolving claims of improper juror exclusion, it is not at all uncommon for courts to consider whether the "inexorable zero" phenomenon is in effect. Although not specifically labeled as such, the "inexorable zero" factor carries considerable weight when courts consider *Batson* challenges. In *McClain*, 217 F.3d at 1224, we held that "the fact that all blacks in the venire pool were struck raises an inference of discrimination." We also noted that "the seriously disproportionate exclusion of blacks from the jury venire is powerful evidence of intentional race discrimination." *Id.* at 1223 (citing *Batson*, 476 U.S. at 93, 106 S.Ct. 1712). *See also Miller–El v. Cockrell*, 537 U.S. 322, 331, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (recognizing that the respective percentages of excluded racial groups is relevant).

The state courts in this case gave absolutely no thought to the fact that the state's peremptory challenges were used to remove every prospective Native American juror from the jury panel. The courts simply did not conduct the inquiry or make the findings contemplated by the mixed motives rubric.

As noted in the majority opinion, once the defendant has established that the exercise of a peremptory challenge was motivated, at least in part, by considerations of race or ethnicity, the burden shifts to the prosecution to prove that it would have exercised the peremptory challenge even in the absence of racial or ethnic motivations. *Cf. Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Village of Arlington Heights v. Metro Housing Develop. Corp.*, 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Gattis v. Snyder*, 278 F.3d 222, 233 (3d Cir.2002); *Jones v. Plaster*, 57 F.3d 417, 421 (4th Cir.1995).

The mixed motives analysis parallels the pretext analysis elucidated in *Batson*, as the purpose of both is to isolate the true reason for the exercise of the peremptory

sions cannot be predicated on mere 'stereotyped' impressions about the characteristics of [the prospective employees] ... It precludes treatment of individuals as simply components of a racial, religious, sexual or national class ...." (citation omitted); cf. *Batson*, 476 U.S. at 97, 106 S.Ct. 1712 (forbidding the exclusion of prospective jurors based upon assumptions about the ethnic group to which the jurors belong).

In Title VII jurisprudence, the practice of excluding all individuals of a particular ethnic group is referred to as the phenomenon of the "inexorable zero." *See Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 265 (2d Cir.1981); *see also NAACP v. Town of East Haven*, 70 F.3d 219, 225 (noting that "the district court ... must also consider the fact of the inexorable zero.") (internal quotation marks omitted); *United States v. Gregory*, 871 F.2d 1239, 1245 (4th Cir.1989); *Capaci*, 711 F.2d at 662 (noting that the court "differ[ed] with the defendant's suggestion that zero is just a number." Rather, "the courts have been particularly dubious of attempts by employers to explain away the inexorable zero when the hiring columns are totalled") (citations and internal quotation marks omitted); *EEOC v. Atlas Paper Box Co.*, 868 F.2d 1487, 1501 n. 21 (6th Cir.1989) (Cook, J., concurring in part and dissenting in part); *EEOC v. O & G Spring and Wire Forms Specialty Co.*, 38 F.3d 872, 879 (7th Cir.1994) (noting that "[t]he district court flagged the bottom line in the case: the inexorable zero.") (internal quotation marks omitted); *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1555 n. 14 (11th Cir.1994); *Hammon v. Barry*, 826 F.2d 73, 75 n. 3 (D.C.Cir.1987) (recognizing that the case of *Johnson v. Transportation Agency, Santa Clara County, California*, 480 U.S. 616, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) involved the "inexorable zero" factor). Existence of the "inexorable zero" in Title VII cases raises the judicial eyebrow. *See Capaci*, 711 F.2d at 662 (describing the "particular dubiousness" of the court in response to efforts to explain away the "inexorable zero") (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 342 n. 23, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

challenge. *See Howard,* 986 F.2d at 30 (noting that the outcome of the mixed motives case rested on whether the prosecutor "could sustain *his* burden of showing that he would have exercised his challenges solely for race-neutral reasons.") (emphasis in the original); cf. *Lewis v. Lewis,* 321 F.3d 824, 830–31 (9th Cir.2003) ("It is in the third step ... that the court reaches the real meat of a *Batson* challenge." It is at this stage that the court "explor[es] the possibility that facially race-neutral reasons are a pretext for discrimination.") (citation omitted); *Howard,* 986 F.2d at 27 (stating that "[d]ual motivation analysis ... may supplement ... 'pretext' analysis").

In conducting the mixed motives/*Batson* pretext analysis, the court is to consider "all the evidence on the record." *Riley v. Taylor,* 277 F.3d 261, 279 (3d Cir.2001) (en banc); *see also Lewis,* 321 F.3d at 830 (commending a review of the record); *Howard,* 986 F.2d at 30 (remanding for application of mixed motives analysis on the record).

The fact that the reason given for the exercise of a peremptory challenge "corresponds to a valid for-cause challenge will demonstrate its race-neutral character." *Hernandez v. New York,* 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). On the other hand, the articulation of "a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race" may be evidence of pretext, *see id.,* especially as it approaches the "inexorable zero." *See McClain,* 217 F.3d at 1224 ("the fact that all blacks in the venire pool were struck raises an inference of discrimination.") (citation omitted).

Finally, the reason given to support the exercise of the peremptory challenge must be "related to the particular case to be tried." *Batson,* 476 U.S. at 98, 106 S.Ct.

1712; *see also United States v. Thompson,* 827 F.2d 1254, 1257 (9th Cir.1987).

It is the obligation of the trial court, when ruling upon a *Batson* challenge, to gauge the persuasiveness of the race-neutral reasons offered for the exercise of the peremptory challenge. At bottom, this determination is an assessment of the prosecutor's credibility. *Miller–El,* 537 U.S. at 339, 123 S.Ct. 1029. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Id.*

> [I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination. Similarly, a comparative analysis of the struck juror with empaneled jurors is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination. After analyzing each of the prosecutor's proffered reasons, our precedent suggests that the court should then step back and evaluate all of the reasons together. The proffer of various faulty reasons and only one or two otherwise adequate reasons, may undermine the prosecutor's credibility to such an extent that a court should sustain a *Batson* challenge.

*Lewis,* 321 F.3d at 830–31 (citations and internal quotation marks omitted).

It is unfortunate, but true, that the state courts engaged in no analysis of the record or of the prosecutor's proffered race-neutral reasons for the peremptory challenges. We cannot ignore that dereliction. *See Howard,* 986 F.2d at 30 (remanding the case because the state court did not place the dual motivation burden upon the prosecutor). After hearing the prosecu-

tor's explanation, the state trial court ruled: "All right. The Court finds there is sufficient justification to support the peremptory challenges. With regard to Miss Rindels, my understanding of what [the prosecutor] said is that-one of them is at least that she worked for the tribe, not because she was one of the tribe, but she worked for the tribe. That's entirely different, other than the fact if she's [I]ndian, if she is." [5]

In discussing the peremptory challenge of Juror Rindels, the California Court of Appeal listed the other reasons provided by the prosecutor: 1) "[s]he was pretentious ... and self-important"; 2) "[s]he was *emotional about the system*"; 3)[h]er daughter had been molested by her father ... indicative of something of a dysfunctional family"; 4) she was "somewhat unstable, fairly weak and somebody who ... would be easily swayed by the defense." (emphasis in the original).

The Court of Appeal determined that the reasons given by the prosecutor "are race-neutral." However, that is only half of the inquiry under a mixed motives analysis. The other half is whether the prosecutor credibly demonstrated that he would have exercised the peremptory challenge despite the race-based statements that informed his decisions. This inquiry was never pursued by the trial court or by the appellate court. There was no consideration of the record as a whole, no comparative analysis with other jurors, no examination of the relevance of the proffered

reasons to the case, and no recognition of the "inexorable zero" factor.[6]

In denying habeas relief, the majority opinion relies upon the deference owed to the rulings of state courts on habeas review. However, "deference does not imply abandonment or abdication of judicial review." *Miller–El*, 537 U.S. at 340, 123 S.Ct. 1029. This case is akin to that considered by the Third Circuit in *Riley*. In that case, the court recognized that"[d]eference in a *Batson* case must be viewed in the context of the requirement that the state courts engage in the three-step *Batson* inquiry." 277 F.3d at 286.

As is true in this case, in *Riley* "the state courts failed to examine all of the evidence to determine whether the State's proffered race-neutral explanations were pretextual. Not only is there no indication on the record that the hearing judge engaged in the required analysis, but there is no indication that the [state appellate court] did so ..." *Id.*

As is also true in this case, "[t]he omission of the crucial step of evaluating the State's proffered explanations in light of all the evidence can be gleaned by the absence of the word 'pretext' in both the opinion of the hearing judge and in the opinion of the [appellate court]. Nor is there any language in either opinion that suggests, *whatever the words used,* that either court recognized the nature of the analysis it was required to undertake." *Id.* (emphasis added).

As did the Third Circuit, I recognize that no magic words are required to reflect

---

5. The record reveals that this finding by the district court was clearly erroneous. The prosecutor referenced Miss Rindels as a "[*N*]*ative American* [] employed by the tribe." (emphasis added).

6. The Court of Appeal's lapse was even more egregious for jurors Lawton and Smithfield, because the trial court did not even discuss

the prosecutor's proffered reasons for excluding them from the jury. The Court of Appeal acknowledged the prosecutor's stereotypical "underlying assumption that Native Americans as a group are 'anti-establishment,' " but did not evaluate the "race-neutral" reasons against the race-based backdrop of the prosecutor's stereotypical remarks.

that the proper analysis has been performed. Nevertheless, the fact remains that there are *no* words in the California Court of Appeal decision reflecting that it performed a pretext analysis or a mixed motives analysis. As judicial officers, we have a solemn obligation to fulfill the promise of *Batson:* a jury selection process untainted by the specter of racism. Because neither the trial court nor the appellate court engaged in the inquiry required by *Batson,* the state court's "finding that the prosecutor did not purposefully discriminate in exercising peremptory challenges against Jurors [Rindels, Lawton, and Smithfield] was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *McClain,* 217 F.3d at 1224 (citation and internal quotation marks omitted).

Rather than denying the habeas petition in this case, I would follow the lead of *Howard,* a case relied upon by the majority, and grant a conditional writ requiring the state court to conduct a proper mixed motives analysis. *See* 986 F.2d at 30. Accordingly, I respectfully dissent.